UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
)
v. )                   CRIMINAL NO. 04-10339-PJB
)                   NH CR04-213-01-PB
TIMOTHY P. SCHROEDER and )
STEVEN A. MILKIEWICZ, )
)
            Defendants. )

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE "BID RIGGING" ALLEGATIONS AND EVIDENCE

The government's superseding indictment describes three general schemes, one of which is that defendant, Steve Milkiewicz, "rigged bids" in connection with sales he made to the Clerk's Office. Superseding Indict., ¶s 5, 12, 19. The fatal flaw in the government's bid rigging allegations is that there is no federal rule or regulation creating a bidding process. Rather, to establish a "bidding process," the government appears to rely on a private, internal "guide" that itself does not even create a bidding process. Thus, Steve Milkiewicz cannot be found to have "rigged" a bidding process when there was no legally-required process to begin with.

These bid rigging allegations, which permeate the indictment, confuse and distort the government's main allegations here that Mr. Milkiewicz allegedly (1) charged for product he did not deliver, and (2) bribed Mr. Schroeder, the Clerk's Office employee, for business. (Superseding Indictment, ¶¶13 & 14) Accordingly, Mr. Milkiewicz seeks to preclude the government under Federal Rule of Evidence 403 from presenting a "bid rigging" case at trial to prove its non-bid-related charges. Specifically, the bid rigging case should be eliminated from the trial by, among other things, prohibiting the government from introducing any evidence of,

or commenting in its opening about, bids, bidding, "bid rigging" or Steve Milkiewicz purportedly securing multiple "bids" for sales. Such evidence – including the introduction of the guide itself, the introduction of supposed price quotes/bids and testimony about a "bid process" – is improper because it has no probative value given that there is no legally-binding bidding requirement.

Even if the government's evidence of supposed "big rigging," such as the manual, quotes, and testimony, have some arguable probative value, they should nonetheless be excluded under Rule 403because allowing the government to present a bid rigging case will confuse and mislead the jury into thinking that written bids were somehow a required part of the procurement process and/or that the charges before them are criminal "bid rigging" charges.

There is more than enough in the indictment to litigate at trial without allowing the government to prolong and confuse the case by introducing evidence of "bid rigging" where there is no such bidding system in place to be rigged. Thus, those allegations should be excluded.

## FACTS

Defendant Steven Milkiewicz has worked for many years as a vendor/broker selling office supplies and furnishings to many different departments at the courthouse and elsewhere, including the Clerk of Courts for the United States District Court for the District of Massachusetts. See Superseding Indictment, ¶8, 9, attached as Exhibit 1. Mr. Milkiewicz ran his own supply businesses and, prior to that, worked for other supply companies. Id., ¶8.

Mr. Milkiewicz's alleged co-conspirator, Timothy Schroeder, was the Property and Procurement Administrator for the Clerk's Office during all times relevant to the indictment. Id., ¶2. On January 3, 2005, Mr. Schroeder pled guilty to the charges in the superseding indictment, including the charges that, for a nearly six-year period, he used a dummy company (M.S. &

Associates) to steal approximately $180,000 from the Clerk's Office by billing the government for goods that did not exist. See transcript from January 3, 2005, hearing attached at Exhibit 2. There is no allegation in the indictment, and there is no evidence, that Mr. Milkiewicz had anything to do with Mr. Schroeder's bold scheme using M.S. & Associates to defraud the government.

Distinct from these allegations against Mr. Schroeder involving M.S. & Associates, the government alleges that Mr. Milkiewicz was part of a scheme to defraud the government. Specifically, the superseding indictment alleges counts against Mr. Milkiewicz for conspiracy (Count I), False Claims Against the United States (Counts 2-9), Bribery of a Public Official (Count 11), and Filing False Tax Returns (Counts 17-21).    According to the Superseding Indictment, these Counts arise out of three main schemes:

(1)    Allowing Mr. Milkiewicz to sell to the Clerk's Office "without submitting to genuine competitive bidding" (Superseding Indictment, ¶12);

(2)    Charging for goods and services that were not delivered (Superseding Indictment, ¶13);

(3)    Paying Mr. Schroeder a portion of Mr. Milkiewicz's profits from his dealings with the Clerk's Office (Superseding Indictment, ¶14);

It is the first of these three alleged schemes, the "bid rigging" allegations, that is the subject of this motion. The bid-rigging allegations of the Indictment focus primarily on the theory that Mr. Milkiewicz rigged "bids" to win the Clerk's Office's business. Specifically, the indictment says, "[t]he scheme worked in several different ways, all designed to ensure that the defendants controlled the bidding process and prevented open and fair competitive bidding." The indictment charges that, "[a]t times pertinent to this Indictment, procurement regulations under which defendant Schroeder operated and internal policies followed by the Court required

that Schroeder to obtain [sic] multiple quotes and bids for contracts above a fixed dollar threshold." Indictment, ¶5. The government alleges that, "[a] major purpose and objective of the conspiracy was to enable Milkiewicz to profit from selling goods and services to the Court, without submitting to genuine competitive bidding." Id. ¶12. And the government summarizes its various theories by stating that, "[t]he result of these various sham bidding arrangements was to create the false impression that defendant Schroeder had complied with <u>rules and regulations that required the solicitation of multiple bids</u>." Id., ¶19 (emphasis added).

Likewise, at Mr. Schroeder's change of plea hearing on January 3, 2005, the government stated that one of the "schemes" Mr. Schroeder participated in was "a classic bid-rigging scheme." See Exhibit 2, pp. 21-22. The government went on to say that Mr. Schroeder "was obligated to obtain multiple bids or competitive price quotes to get competitive quotes for supplying goods and services to the court…" Id.

The indictment enumerates the following as legally-mandated "bidding" rules:

    (1) The requirement that Mr. Schroeder seek multiple bids above a fixed dollar threshold (see Superseding Indictment, ¶5);

    (2) The implied assumption that it was illegal or improper for Mr. Milkiewicz to receive multiple and/or repetitive orders from Mr. Schroeder. See ¶23 (charging as "loss" profits Mr. Milkiewicz made on goods the government agrees were delivered in full as ordered); ¶12 (accusing Mr. Milkiewicz of profiting from sales to the Clerk's Office without competitive bidding); ¶17 (suggesting that the Mr. Milkiewicz could only get business if he was the successful bidder).

The quotes, which the government treats as "bids," are a critical component of the government's "bid rigging" allegations. Six of the eleven overt acts in the conspiracy count allege that Mr. Milkiewicz submitted, or caused to be submitted, more than one price quote for particular jobs.[1]

---

[1] These transactions are those described under the following headings in Count I: "December 1998-January 1999

In light of these allegations, there are two separate loss amounts alleged in the indictment. First, the government alleges that Mr. Milkiewicz is responsible for $155,000 in loss the government says reflects "excess" charges for items that, it concedes, Mr. Milkiewicz did in fact provide to the court. Superseding Indictment, ¶23. Because these goods were actually provided, the government believes that the $155,000 represents ill-gotten gains to which the defendant was not entitled and would not have received but for the "bid rigging." Second, the government alleges that there is "an additional $107,000 in loss for goods that were never delivered."[2]

## ARGUMENT

### I.    The Government Should Be Prohibited Under FRE 403 From Presenting a "Bid Rigging" Case at Trial

A large portion of the loss figure about which the government complains (the $155,000) is Mr. Milkiewicz's profit on goods the government agrees were sold to the Court as ordered. This figure appears to be based on the government's premise that the Clerk's Office "did not receive the benefit of an honest bidding process." Superseding Indictment, ¶22. The problem is that there are no regulations mandating a "bidding process." Rather, at best, there appears to be a non-public, internal document by which the Administrative Office of the Courts, which oversees the Clerk's Office, suggests that its employees should seek multiple price quotes (oral or written) in certain situations. As discussed more fully below, Mr. Milkiewicz asks the Court to prohibit the government from presenting a "bid rigging" case as there is, quite simply, no bid requirement

---

Transaction" (¶s 25-29); "January-February 2000 Transaction" (¶s 32-37); "April 2000 Transaction" (¶s 38-42); "August 2000 Transaction" (¶s 47-51); "September-October 2001 Transaction" (¶s 56-60); March-April 2002 Transaction" (¶s 61-64).

[2]   While the indictment references only $107,000 in loss for deliveries that were allegedly "shorted," undersigned counsel understands that the government also intends to argue at trial that there was an additional $70,599 for goods that were supposedly not delivered at all.

and no legal limitation on the volume of business Mr. Milkiewicz was permitted to conduct with

the Clerk's Office.  Specifically, as discussed below, the government should be prohibited from

introducing evidence of bid rigging, including, among other things, the price quotes, the manual

itself, and testimony of Clerk's Office personnel wrongly characterizing the guide's suggestions

as binding regulation.  (See Section I.A. below.)  Even if there is some probative value to all or

some of this evidence, allowing the government to present a bid rigging case in the face of a non-

binding, internal guide would mislead and confuse the jury into thinking this was a "closed bid"

system and that there was a bid rigging crime alleged.  (See Section I.B. below.)

### A.  The Government Should be Prohibited from Presenting a "Bid-Rigging" Case Under Rule 403 of the Federal Rules of Evidence Because There are No Regulations Mandating Competitive Bidding for the Clerk's Office and Thus, the Bid Rigging Case and Evidence Have No Probative Value

The Clerk of Courts for the United States District Courts is administered by the Director

of the Administrative Office of the Courts, under the supervision and direction of the Judicial

Conference of the United States.  28 U.S.C. §604(a)(1).  Congress has vested the Director with

the authority to promulgate regulations to carry out his or her functions.  28 U.S.C. §604(f).

Specifically, Congress has said that, "[t]he Director may make, promulgate, issue, rescind, and

amend rules and regulations (including regulations prescribing standards of conduct for

Administrative Office employees) as may be necessary to carry out the Director's functions,

powers, duties, and authority. The Director may publish in the Federal Register such rules,

regulations, and notices for the judiciary branch of Government as the Director determines to be

of public interest, and the Director of the Federal Register hereby is authorized to accept and

shall publish such materials." The Director's power to enact rules and regulations cannot be delegated to anyone else. 28 U.S.C. §602(d).

Despite its exclusive powers to enact regulation governing its areas of authority, which authority includes overseeing procurement activities of the United States Clerks of Court (18 U.S.C. § 604(a)(10)), the Director has not promulgated any regulation governing procurement. While the Director has, for example, exercised its right to adopt regulations in the areas of rates of pay for the judicial branch (47 F.R. 4715-01 (1982 WL 129282)), there are no regulations enunciating the "bidding" and procurement rules the government alleges Mr. Milkiewicz has violated, namely:

- The requirement that Mr. Schroeder seek multiple bids above a fixed dollar threshold (see Superseding Indictment, ¶5);

- The implied assumption that it was illegal or improper for Mr. Milkiewicz to receive multiple and/or repetitive orders from Mr. Schroeder. See ¶23 (charging as "loss" profits Mr. Milkiewicz made on goods the government agrees were delivered in full as ordered); see ¶12 (accusing Mr. Milkiewicz of profiting from sales to the Clerk's Office without competitive bidding); see ¶17 (suggesting that the Mr. Milkiewicz could only get the business if he was the successful bidder).

Despite the absence of regulation in this area, the government takes the position that Mr. Milkiewicz's business activities with the Clerk's Office are somehow governed by an internal guide, not publicly available, that the Director apparently circulated to assist with procurement. Put another way, the bid-rigging prong of the government's criminal charges against Mr. Milkiewicz, who was not a federal employee, relies on guidance set forth in an employee manual. Specifically, the government has provided undersigned counsel with a binder containing an "Administrative Manual" entitled, "Guide to Judiciary Policies and Procedures." Counsel understands, and the exhibits reflect, that this guide sets forth the procurement rules that the government believes Mr. Milkiewicz has supposedly violated.

The binder provided to Mr. Milkiewicz's counsel states that it is "Chapter VIII Procurement, Contracting and Property Management." On information and belief, that guide is not publicly available. Id. Indeed, undersigned counsel has attempted to obtain the complete guide from which Chapter VIII was taken, but has been unable to do so and was told by the office of the Director that it was not available for sale. Id. In fact, in refusing to produce that guide, which defendant sought by subpoena from the Clerk's Office, the Clerk's Office takes the position that all information on the "JNET" – including the guide – is "confidential and proprietary." See Letter from Thomas Reed dated August 17, 1005 (attached as Exhibit 3).[3]

That guide is the document that purports to impose the bidding and other requirements the government believes were violated. But that document – in addition to not being a criminal code or standard – did not go through the publication and comment period mandated by the Administrative Procedures Act, a prerequisite for any binding regulation. 5 U.S.C. §553. To the contrary, that document is not even available to the public, as discussed above. For this reason, at least one court has held that the very guide at issue, the "Guide to Judiciary Policies and Procedures," is not a binding regulation, even in a civil case. Novell, Inc. v. United States, 46 Fed. Cl. 601, 615 (2000). There, the Federal Court of Claims dismissed a civil suit brought by a vendor that failed to win a government contract; the plaintiff there alleged that the Administrative Office of the Courts had not complied with its own "bidding" rules. The plaintiff attempted, among other things, to rely on the procurement recommendations in the Guide. But the Court correctly noted that that Guide "is not entitled to the force of law." Id.

To give this internal guide, which is not publicly available and does not have the force of law, binding effect with criminal sanctions would violate the most basic Due Process principle

---

[3] Thus, defendant has only one chapter of this multi-volume guide, and also has no information as to whether this version was in place during the time of the alleged conspiracy, or whether it changed throughout that period.

8

that a person be given notice that behavior is criminal before criminal sanctions can be imposed. United States v. Harriss, 347 U.S. 612, 617 (1954) (requiring notice of criminal statutes based on the underlying principle that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed). Courts uniformly apply the principle of lenity where a criminal code is ambiguous. See Pasquantino v. U.S., 125 S.Ct. 1766, 1787 (2005). Principles of lenity apply ten fold where the government attempts to take one person's (Schroeder's) internal obligations (if indeed they rise to that level) under an employee manual and make those obligations the basis for criminal bid-rigging allegations against an outsider, Mr. Milkiewicz, who does not even have access to this internal Guide.

The Administrative Office, using its regulatory authority, presumably could have passed regulations creating an actual bidding process and bringing Mr. Milkiewicz and Mr. Schroeder within the scope of that process. But it apparently chose not to. In the absence of any regulations creating a bid system, there is no requirement that may be imposed on Mr. Milkiewicz to engage in so-called competitive bidding. Nor is there any legal restriction on the amount of business Mr. Milkiewicz could do with the Clerk's Office. Even if Mr. Schroeder was supposed to follow this private, internal guide about the best way to procure supplies as a responsibility of his employment, there was no legal duty on either Mr. Milkiewicz or Mr. Schroeder, certainly not one that can be the foundation of a criminal "bid rigging" case.

The notion that no bids were required is not a revolutionary position, despite the government's belief, as expressed throughout the indictment, that "bids" would make sense and therefore, must have been mandated. To illustrate, even under the guide that the government says applies here, there are no quotes necessary for purchases of under a $2,500 threshold. And, the evidence will show that Mr. Schroeder routinely bought office supplies, without quotes or bids,

using his personal or work credit card. Id. Again, defendant disputes that the $2,500 is even a

binding rule. But it illustrates that, even under the government's view, quotes are not always

required. In contrast, the guide does appear to set forth a more formal bid process for purchases

exceeding $25,000. See Guide, p.10 ("For open market procurements over $25,000 but less than

$100,000, local advertisements and formal solicitation of written bids or proposals are

required.") (emphasis in original). But those requirements did not apply to the sales at issue

here, which were all less than $25,000. Absent any binding rules, Mr. Schroeder's purchases

through Mr. Milkiewicz are entitled to no further scrutiny, and no further documentation by way

of "bids" or the like, than the numerous purchases Mr. Schroeder was apparently allowed to

make without quotes or bids. Absent some regulation to the contrary, all such business in which

Mr. Milkiewicz was involved could likewise be conducted without quotes.

And, even if there was an internal guide at the Clerk's Office that created internal

paperwork requirements for Mr. Schroeder on the subject of pricing, that guide (1) is not legally

binding on anyone and (2) certainly did not extend by any law or regulation to Mr. Milkiewicz.

In order to win a conviction for conspiracy to defraud (Count I) or for false claims (Counts 2

through 9), the government must prove the element of materiality. Neder v. United States, 527

U.S. 1, 16 (1999); United States v. Snider, 502 F.2d 645, 652 n.12 (4th Cir. 1974); United States

v. Foster, 229 F.3d 1196, n.2 (5th Cir.2000) (recommends in dicta that materiality be considered

an element in light of Neder decision).[4] Even viewing the facts in the government's favor, if the

government can show Mr. Milkiewicz caused these quotes to be submitted, the best the

government could do would be to show that Mr. Milkiewicz helped Mr. Schroeder comply with

an internal paperwork requirement. But allowing the quotes to be admitted at trial will create a

---

[4] The First Circuit has not ruled on the issue of materiality in the false claims context. However, the government, in its proposed jury instructions, has agreed that this element should be considered by the jury here.

real risk that the jury will erroneously treat these quotes as "bids" or wrongly conclude that there

was some legally-binding limit on the volume of business Mr. Milkiewicz was permitted to

conduct with the Clerk's Office. See United States v. Lachman, 48 F.3d 586, 592-593 (1st

Cir.1995) (allowing exclusion of government evidence and requiring government to find less

dangerous way of proving familiarity with regulation, even if it is less potent, in order to avoid

possibility of juror confusion); Williams v. Drake, 136 F.3d 44, 48 (1st Cir. 1998) (providing for

exclusion of relevant evidence that carries unwanted baggage of potential juror confusion).

     For these reasons, the government should be ordered not to present a "bid rigging" case,

and all evidence bearing on that non-existent offense must be excluded.

> **B. The Bid Rigging Allegation Must be Excluded Under Rule 403 of the Federal Rules of Evidence Because Any Limited Probative Value Is Vastly Outweighed By the Real Risk that the Jury Will be Confused Into Believing This is a Bid Rigging Prosecution Even Though There is No Such Crime Charged**

     Even if there is some limited probative value to some of the evidence the government

intends to rely on to show "bid rigging," that evidence should be excluded because its

"probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury…." Fed. R. Evid. 403. As discussed below, the quotes and related

evidence are of limited, if any, probative value because there is no legally-required bidding

process to rig.  Furthermore, even if there was a legally-required bidding process that imposed

duties on Mr. Schroeder, the balance would still tip strongly in favor of prohibiting the

government from litigating a bid rigging case because that evidence, including the guide and

written quotes, would confuse the jury into treating this case as a bid rigging case when no

requirements of the guide were of legal force and effect, or were imposed on (or even available

to) Mr. Milkiewicz. Moreover, and equally important under FRE 403, the presentation of a bid rigging case will unnecessarily prolong this trial which is already expected to last approximately two weeks.

Given that there is no bidding process that applied here, the government's interest in putting on a lengthy bid-rigging case is strongly outweighed by the danger that the jury will mistakenly treat the guide and evidence on bid rigging as something other than an internal policy the Clerk's Office created for its employees. In short, the government's entire indictment, as it relates to the $155,000, is premised on the misconception that somehow Mr. Milkiewicz is obligated to get the best price for the government; he is not.

## CONCLUSION

There are no regulations that are the source of any "bidding" duty or requirements on Mr. Milkiewicz or on Mr. Schroeder. Therefore, the government should not be permitted to put on a bid rigging case at trial. Accordingly, all evidence of so-called "bid rigging" must be excluded and any reference to these non-existent bidding rules and regulations must be prohibited at trial or they will confuse the jury on the real issues at trial: whether all goods were actually delivered and whether Mr. Milkiewicz bribed Mr. Schroeder. For these reasons, defendant request that the Court:[5]

1.  Prohibit the government from presenting and/or arguing a "bid rigging case";

---

[5] At a bare minimum, the government should not be permitting to use the word "bid," or to otherwise suggest to the jury that there was a mandatory bid system in place relative to the allegations in the indictment.

2.  Exclude the guide from being introduced at trial;

3.  Exclude any and all testimony concerning the guide and/or so-called bidding requirements;

4.  Exclude all pricing submissions, which the government calls "bids" or "quotes";

5.  Prohibit the government from referring to price submissions as "bids";

6.  Exclude any other evidence, and prohibit any other argument, concerning bid rigging that may arise at trial.

STEVEN A. MILKIEWICZ,
By his attorneys,


_____ /s/  Michelle R. Peirce_____

Bruce A. Singal, BBO#464420
Michelle R. Peirce, BBO #557316
Donoghue, Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, MA  02108
(617) 720-5090


Dated:   August 29, 2005


CERTIFICATE OF SERVICE

I, Michelle R. Peirce, hereby certify that I have caused copies of the foregoing document to be served upon by first class mail, postage prepaid to be served upon Maryanne Michaelis, Clerk, United States District Court, District of New Hampshire, 55 Pleasant Street, Room 110, Concord, NH 03301-3941 and Paul Levenson, Assistant U.S. Attorney, United States Attorney's Office, One Courthouse Way, Suite 9200, Boston, MA  02210, this 29th day of August, 2005.


_____ /s/   Michelle R. Peirce_____
Michelle R. Peirce

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | CRIMINAL NO. 04-10339-PJB |
| UNITED STATES OF AMERICA ) | NH  CR04-213-01-PB |
| ) | VIOLATIONS: |
| v. ) | 18 U.S.C. §371 (conspiracy to defraud United States and |
| ) | to commit offenses) |
| TIMOTHY P. SCHROEDER and ) | 18 U.S.C. § 287 (False Claims Against United States) |
| STEVEN A. MILKIEWICZ, ) | 18 U.S.C. § 201 (Bribery of Public Official) |
| ) | 18 U.S.C. § 641 (Embezzlement of Public Monies) |
| defendants. ) | 26 U.S.C. § 7206(1) (subscribing false tax returns) |
| ) | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

1.    At all times pertinent to this Indictment, defendant TIMOTHY P. SCHROEDER
was a resident of Plymouth, Massachusetts and was employed as the Property and Procurement
Administrator for the Clerk of Court for the United States District Court for the District of
Massachusetts, hereinafter "the Court," a job he had held under one title or another for
approximately twenty years.

2.    At times pertinent to this Indictment, as part of his duties as the Property and
Procurement Administrator, defendant SCHROEDER oversaw the purchasing of office supplies
and furnishings for use by the judges and judicial staff of the Court.

3.    Due in part to his long tenure in the position, defendant SCHROEDER became
trusted by the Clerk of the Court and by the judges of the Court, who relied upon him to
administer the Court's procurement policies and procedures in an efficient and ethical manner.

4.    At times pertinent to this Indictment, because of the trust placed in him defendant
SCHROEDER was subject to little day-to-day supervision in his tasks as the Procurement and

Property Administrator. Effectively, defendant SCHROEDER determined who would be awarded the contracts for office supplies and furnishings.

5.    At times pertinent to this Indictment, procurement regulations under which defendant SCHROEDER operated and internal policies followed by the Court required that SCHROEDER to obtain multiple quotes and bids for contracts above a fixed dollar threshold.

6.    In or about 1997, the exact date being uncertain, defendant SCHROEDER created a business entity identified as MS & Associates, which purported to be an office supply business. In actuality, as defendant SCHROEDER well knew, MS & Associates was not an office supply business. It was a fictitious entity controlled by defendant SCHROEDER himself.

7.    At times pertinent to this Indictment, defendant SCHROEDER controlled a series of bank accounts in the name of MS & Associates. Defendant SCHROEDER also controlled a post office box in his name and that of MS & Associates.

8.    At all times pertinent to this Indictment, defendant STEVEN A. MILKIEWICZ was a resident of Scituate, Massachusetts. Defendant MILKIEWICZ owned and operated office supply businesses, including businesses known as "J. Cameron Company" and "C.J. Sales." In addition to owning J. Cameron Company and C.J. Sales, defendant MILKIEWICZ had worked for many years in the office supply business. As a result, he was familiar with, and had contacts at many office supply companies, and occasionally caused them to act on his behalf.

9.    At times pertinent to this Indictment, through J. Cameron Company, C.J. Sales and through other businesses known to the Grand Jury, defendant MILKIEWICZ did a large volume of business with the Court, selling office supplies such as personalized stationery for the Court's judges, letterhead, envelopes, toner for computer printers, and office furniture.

-2-

## COUNT ONE

### (Conspiracy to Defraud the United States - 18 U.S.C. § 371)

10.    Paragraphs 1 through 9 are re-alleged and incorporated herein.

11.    Between approximately 1997 and July 3, 2002, at Boston in the District of

Massachusetts and elsewhere,

### TIMOTHY P. SCHROEDER

and

### STEVEN A. MILKIEWICZ

defendants herein, together with others known and unknown to the Grand Jury, knowingly and

unlawfully conspired and agreed with each other to defraud the United States and an agency

thereof, to wit, the United States District Court for the District of Massachusetts.

## OBJECTIVES OF THE CONSPIRACY

12.    A major purpose and objective of the conspiracy was to enable MILKIEWICZ to

profit from selling goods and services to the Court, without submitting to genuine competitive

bidding.

13.    Another major purpose and objective of the conspiracy was to enable

MILKIEWICZ to steal money from the United States by charging for goods in services that were

not actually delivered, in whole or in part, to the Court.

14.    Another major purpose and objective of the conspiracy was to enable

SCHROEDER to profit from his abuse of his position as the Property and Procurement

Administrator for the Clerk of Court by sharing in the proceeds of MILKIEWICZ's fraudulent

dealings with the Court.

-3-

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspirators accomplished the goals of the conspiracy included, among others, the following:

15.    Beginning in or about 1997, defendants SCHROEDER and MILKIEWICZ agreed to and did work together to defraud the United States by rigging the bidding process for the provision of office supplies and furniture to the Court, in order to ensure that defendant MILKIEWICZ would be the successful bidder.

16.    The scheme worked in several different ways, all designed to ensure that the defendants controlled the bidding process and prevented open and fair competitive bidding.

17.    On some occasions, defendant MILKIEWICZ submitted to the Court multiple bids under the names of different companies, thus ensuring that he benefitted. On other occasions he caused bids to be submitted to the Court in the names J. Cameron Company and C.J. Sales, while defendant SCHROEDER submitted to the Court a third bid from MS & Associates.

18.    On some occasions, defendant MILKIEWICZ fabricated bids, which purported to come from companies where defendant MILKIEWICZ had worked previously and or with whom he had some connection. MILKIEWICZ would than have J. Cameron Company or C.J. Sales underbid the forged bids. On some occasions, defendant STEVEN A. MILKIEWICZ arranged for one or another competitor company to submit an intentionally high bid, knowing that he could bid lower through J. Cameron Company or C.J. Sales. On some occasions, defendant STEVEN A. MILKIEWICZ arranged for a putative competitor to submit the low bid, but then arranged for a portion of that competitor's profit to be turned over to him.

19.    The result of these various sham bidding arrangements was to create the false impression that defendant SCHROEDER had complied with rules and regulations that required the solicitation of multiple bids.

20.    As part of their conspiracy and scheme, the defendants agreed that defendant SCHROEDER would be paid for his role in awarding the contracts to defendant MILKIEWICZ.

21.    One method used to compensate defendant SCHROEDER was to arrange for the Court pay defendant MILKIEWICZ for goods that were not actually delivered.  The defendants split the overpayments, with defendant SCHROEDER receiving a kickback, usually in cash, from defendant MILKIEWICZ.

22.    As a result of the scheme and agreement between the defendants, the Court overpaid for many of the supplies it purchased, and did not receive the benefit of an honest bidding process for office supplies and furnishings.

23.    During the course of the conspiracy, MILKIEWICZ and SCHROEDER caused the Court to pay approximately $155,000 in excess charges for items provided to the Court, and an additional $107,000 for goods that were never delivered.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance of the conspiracy, the following individuals did the following acts, among others:

### October 1998 Transaction

24.    On or about October 27, 1998, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $1,004.50 purportedly in payment for printed checking envelopes.  As defendant SCHROEDER well knew, the envelopes at issue had been paid for during August 1998.

-5-

December 1998 - January 1999 Transaction

25.    On or about December 23, 1998, defendant MILKIEWICZ caused to be submitted to the Court two price quotes for 5400 bar-code labels, one in the name of J. Cameron Company and another in the name of a company with which MILKIEWICZ was affiliated.

26.    In or about December 1998, defendant SCHROEDER caused to be submitted to the Court a price quote for bar-code labels, in the name of MS & Associates.

27.    In or about December 1998, defendant SCHROEDER caused the Court to order bar code labels from J. Cameron Company.

28.    On or about December 23, 1998, defendant MILKIEWICZ submitted to the Court an invoice, in the name of J. Cameron Company, seeking payment of $3,913.00 for 5400 labels.

29.    On or about January 12, 1999, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $5,252.96, which amount included $3,913.00 in payment for bar-code labels.

October 1999 Transaction

30.    On or about October 5, 1999, defendant MILKIEWICZ submitted to the Court an invoice, in the name of C.J. Sales, seeking payment of $8,760.00, purportedly for delivery of 240 cartons of copying paper.  In actuality, no paper was delivered in connection with that invoice.

31.    On or about October 15, 1999, defendant SCHROEDER caused to be approved a voucher for payment to C.J. Sales in the amount of $8,760.00, as payment for copying paper that was never delivered.

January - February 2000 Transaction

32.     In or about January 2000, defendant MILKIEWICZ caused to be submitted to the Court at least three price quotes for toner and toner cartridges, including one in the name of C.J. Sales, another in the name of J. Cameron Company, and another in the name of a third company.

33.     On or about January 27, 2000, defendant SCHROEDER caused the Court to issue a purchase order for toner and toner cartridges to C.J. Sales, for a total price of  $24,861.25.

34.     On or about January 31, 2000, defendant MILKIEWICZ submitted to the Court an invoice, in the name of C.J. Sales, seeking payment of $24,861.25 for 334 items of toner and toner cartridges.

35.     On or about January 31, 2000, defendant SCHROEDER caused to be approved a voucher for payment to C. J. Sales in the amount of $4,356.25, in partial payment of the January 31, 2000 invoice for toner cartridges.

36.     In or about January and February 2000, defendant MILKIEWICZ caused to be delivered to the Court various toner and toner cartridges, which delivery contained only 248 items, rather than the 334 items set forth in the C.J. Sales invoice.

37.     On or about February 3, 2000, defendant SCHROEDER caused to be approved a voucher for payment to C. J. Sales in the amount of $20,505.00, thereby completing payment of the January 31, 2000 invoice for toner cartridges.

April 2000 Transaction

38.     In or about April 2000, defendant MILKIEWICZ caused to be submitted to the Court at least two price quotes for copier paper, including one in the name of C.J. Sales and another in the name of J. Cameron Company.

-7-

39.     On or about April 24, 2000, defendant SCHROEDER caused the Court to issue a purchase order for 600 cartons of copier paper to C.J. Sales, for a total price of $21,570.00.

40.     On or about April 25, 2000, defendant MILKIEWICZ submitted to the Court an invoice, in the name of C.J. Sales, seeking payment of $21,570.00 for 600 cartons of copier paper.

41.     On or about April 25, 2000, defendant SCHROEDER caused to be approved a voucher for payment to C. J. Sales in the amount of $21,570.00, in payment of the April 25, 2000 invoice for 600 cartons of copier paper.

42.     On or about May 1, 2000, defendant MILKIEWICZ caused to be delivered to the Court only 400 cartons of copier paper, rather than the 600 cartons set forth in the C.J. Sales invoice.

June 2000 Transaction

43.     On or about May 31, 2000, defendant MILKIEWICZ submitted to the Court an invoice, in the name of J. Cameron Company, seeking payment of $5,760.00 for 20 cases of white stationery paper.

44.     On or about June 1, 2000, defendant SCHROEDER caused the Court to issue a purchase order for 20 cases of white stationery paper to J. Cameron Company, for a total price of $5,760.00.

45.     On or about June 1, 2000, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $5,760.00, in payment for 20 cases of white stationery paper.

46.    On or about June 1, 2000, defendant MILKIEWICZ caused to be delivered to the Court only 10 cases of white stationery paper, rather than the 20 cases set forth in the J. Cameron Company invoice.

### August 2000 Transaction

47.    In or about August 2000, defendant MILKIEWICZ caused to be submitted to the Court at least two price quotes for copier paper, including one in the name of C.J. Sales and another in the name of J. Cameron Company.

48.    On or about August 14, 2000, defendant MILKIEWICZ submitted to the Court an invoice, in the name of J. Cameron Company, seeking payment of $17,975.00 for 500 cartons of copier paper.

49.    On or about August 17, 2000, defendant SCHROEDER caused the Court to issue a purchase order for 500 cartons of copier paper to J. Cameron Company, for a total price of $17,975.00.

50.    On or about August 17, 2000, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $17,975.00, in payment for 500 cartons of copier paper.

51.    On or about August 18, 2000, defendant MILKIEWICZ caused to be delivered to the Court only 400 cartons of copier paper, rather than the 500 cartons set forth in the J. Cameron Company invoice.

### September - October 2000 Transaction

52.    On or about September 28, 2000, defendant SCHROEDER caused the Court to issue a purchase order for 500 cartons of copier paper to J. Cameron Company, for a total price of $18,475.00.

53.    On or about October 6, 2000, defendant MILKIEWICZ submitted to the Court an invoice, in the name of J. Cameron Company, seeking payment of $18,475.00 for 500 cartons of copier paper.

54.    On or about October 10, 2000, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $18,475.00, in payment for 500 cartons of copier paper.

55.    On or about October 6, 2000, defendant MILKIEWICZ caused to be delivered to the Court only 400 cartons of copier paper, rather than the 500 cartons set forth in the J. Cameron Company invoice.

### September - October 2001 Transaction

56.    In or about September 2001, defendant MILKIEWICZ caused to be submitted to the Court at least two price quotes for copier paper, including one in the name of C.J. Sales and another in the name of J. Cameron Company.

57.    On or about September 25, 2001, defendant SCHROEDER caused the Court to issue a purchase order for a mixed order of paper, including 400 cartons of copier paper, to J. Cameron Company, for a total price of $17,480.00.

58.    On or about October 9, 2001, defendant MILKIEWICZ submitted to the Court an invoice, in the name of J. Cameron Company, seeking payment of $17,480.00 for a mixed order of paper, including 400 cartons of copier paper.

59.    On or about October 10, 2001, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $17,480.00, in payment for a mixed order of paper, including 400 cartons of copier paper.

60.    In or about October 2001, defendant MILKIEWICZ caused to be delivered to the Court an order of paper which included only 300 cartons of copier paper, rather than the 400 cartons set forth in the J. Cameron Company invoice.

### March - April 2002 Transaction

61.    In or about March 2002, defendant MILKIEWICZ caused to be submitted to the Court at least two price quotes for copier paper, including one in the name of C.J. Sales and another in the name of J. Cameron Company.

62.    On or about April 9, 2002, defendant SCHROEDER caused to be approved a voucher for payment to C.J. Sales in the amount of $13,580.00, in payment for 400 cartons of copier paper.

63.    On or about April 9, 2002, defendant MILKIEWICZ submitted to the Court an invoice, in the name of C.J. Sales, seeking payment of $13,580.00 for 400 cartons of copier paper.

64.    In or about April 2002, defendant MILKIEWICZ caused to be delivered to the Court an order of paper which included only 200 cartons of copier paper, rather than the 400 cartons set forth in the C.J. Sales invoice.

### April 2002 Transaction

65.    In or about April 2002, defendant MILKIEWICZ caused to be submitted to the Court a price quote for toner and toner cartridges in the name of J. Cameron Company.

66.    On or about April 22, 2002, defendant SCHROEDER caused the Court to issue a purchase order for toner and toner cartridges to J. Cameron Company for a total price of $20,185.00.

67.    On or about April 22, 2002, defendant MILKIEWICZ submitted to the Court an invoice, in the name of J. Cameron Company, seeking payment of $20,185.00 for 205 items of toner and toner cartridges.

68.    On or about April 24, 2002, defendant SCHROEDER caused to be approved a voucher for payment to J. Cameron Company in the amount of $20,185.00 in payment of the April 22, 2002, invoice for toner cartridges.

69.    In or about April 2002, defendant MILKIEWICZ caused to be delivered to the Court various toner and toner cartridges, which delivery contained only 147 items, rather than the 205 items set forth in the J. Cameron Company invoice.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO - NINE

### (False Claims Against the United States - 18 U.S.C. § 287)

70.    The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 12-69 of this Indictment, and further charges that:

71.    On or about the dates set forth below, at Boston in the District of Massachusetts and elsewhere,

TIMOTHY P. SCHROEDER  and

STEVEN A. MILKIEWICZ

defendants herein, did make and present to an officer in the civil service of the United States and to a department and agency of the United States, claims upon and against the United States and a department and agency thereof, knowing such claims to be false, fictitious, and fraudulent, to wit, fraudulently inflated invoices submitted to the United States District Court for the District of Massachusetts:

| Count | Date | Claimant | Amount |
|-------|------|----------|--------|
| 2 | 1/31/2000 | C.J. Sales | $24,861.25 |
| 3 | 4/25/2000 | C.J. Sales | $21,570.00 |
| 4 | 5/31/2000 | J. Cameron Company | $5,760.00 |
| 5 | 8/14/2000 | J. Cameron Company | $17,975.00 |
| 6 | 10/6/2000 | J. Cameron Company | $18,475.00 |
| 7 | 10/9/2001 | J. Cameron Company | $17,480.00 |
| 8 | 4/9/2002 | C.J. Sales | $13,580.00 |
| 9 | 4/22/2002 | J. Cameron Company | $20,185.00 |

All in violation of Title 18, United States Code, Sections 287 and 2.

## COUNT TEN

### (Receipt of Bribery by Public Official - 18 U.S.C. § 201)

72.     The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 12-69 of this Indictment, and further charges that:

73.     Between in or about 1997 and on or about July 3, 2002, the exact dates being unknown to the Grand Jury, at Boston and elsewhere in the District of Massachusetts and elsewhere,

### TIMOTHY P. SCHROEDER ,

defendant herein, being a public official, did, directly and indirectly, corruptly demand, seek, receive and accept things of value in return for being influenced in the performance of his official acts, being influenced to commit and aid in committing, and to collude in and allow, the commission of a fraud on the United States, and being induced to do and omit to do acts in violation of his official duties, to wit, kickbacks and commissions paid to him by defendant MILKIEWICZ.

All in violation of Title 18, United States Code, Sections 201(b)(2) and 2.

-14-

## COUNT ELEVEN

### (Bribery of Public Official - 18 U.S.C. § 201)

74.    The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 12-69 of this Indictment, and further charges that:

75.    Between in or about 1997 and on or about July 3, 2002, the exact dates being unknown to the Grand Jury, at Boston and elsewhere in the District of Massachusetts and elsewhere,

### STEVEN A. MILKIEWICZ

defendant herein, did, directly and indirectly, corruptly give, offer and promise to a public official things of value with intent to influence the official acts of the public official, to influence such public official to commit and aid in committing, and collude in, and allow, the commission of a fraud on the United States, and to induce a public official to do and omit to do acts in violation of the public official's lawful duties, to wit, kickbacks and commissions paid to defendant SCHROEDER.

All in violation of Title 18, United States Code, Sections 201(b)(1) and 2.

## COUNT TWELVE

### (Embezzlement of Public Monies - 18 U.S.C. § 641)

76.    The Grand Jury realleges and incorporates by reference paragraphs 1-9 of this Indictment, and further charges that:

77.    On multiple occasions beginning in or about 1997, defendant SCHROEDER caused the Court to award contracts to MS & Associates.

78.    Thereafter, defendant SCHROEDER falsely verified that the Court had received goods supplied by MS & Associates when, in fact, no goods had been provided.

79.    As a result of defendant SCHRODER's actions, the United States Treasury issued payments to MS & Associates on behalf the United States District Court in Boston, totaling approximately $180,000, which payments were addressed to a Post Office box controlled by defendant SCHROEDER.

80.    Because no goods or services were provided by MS & Associates to the Court, the monies paid to that entity were in fact stolen from the United States by defendant SCHROEDER.

81.    Between approximately 1997 and July 3, 2002, at Boston in the District of Massachusetts and elsewhere,

### TIMOTHY P. SCHROEDER

defendant herein, did embezzle, steal, purloin, and knowingly convert to his use and the use of another money and things of value of the United States and a department and agency thereof, such items having a value in excess of $1,000, to wit, approximately $180,000 embezzled through MS & Associates.

All in violation of Title 18, United States Code, Sections 641 and 2.

-16-

## COUNTS THIRTEEN - SIXTEEN

### (Filing False Tax Returns - 26 U.S.C. §7206(1))

82.     The Grand Jury realleges and incorporates by reference paragraphs 1-9, 12-69, 73 and 77-81 of this Indictment, and further charges that:

83.     In filing his tax returns, defendant SCHROEDER failed to report as income the money he embezzled from the Court and the money he received as kickbacks from defendant MILKIEWICZ.

84.     On or about the dates listed below, in the District of Massachusetts and elsewhere,

### TIMOTHY P. SCHROEDER

defendant herein, being a resident of Plymouth, Massachusetts, did willfully make and subscribe joint United States Individual Income Tax Returns, Form 1040, on behalf of himself and his spouse, for the tax years set forth below, which were verified by written declarations that they were made under the penalties of perjury and were filed with the Director, Internal Revenue Service Center at Andover, Massachusetts, which said tax returns he did not believe to be true and correct as to every material matter in that adjusted gross income and joint taxable income were reported in the amounts listed, whereas, as he then and there well knew and believed, adjusted gross income and joint taxable income for each of the tax years substantially exceeded the amounts reported:

| Count | Date Filed | Tax Year | Adjusted Gross Income | Joint Taxable Income |
|-------|-----------|----------|----------------------|---------------------|
| 13 | 11/19/98 | 1997 | $54,834.00 | $31,381.00 |
| 14 | 4/15/99 | 1998 | $56,658.00 | $33,060.00 |
| 15 | 4/15/00 | 1999 | $64,528.00 | $42,624.00 |
| 16 | 5/29/01 | 2000 | $76,186.00 | $50,841.00 |

All in violation of Title 26, United States Code, Section 7206(1).

## COUNTS SEVENTEEN - TWENTY-ONE

### (Filing False Tax Returns - 26 U.S.C. §7206(1))

85.    The Grand Jury realleges and incorporates by reference paragraphs 1-9 and 12-69 of this Indictment, and further charges that:

86.    In filing his tax returns, defendant MILKIEWICZ overstated the costs of the goods he sold and understated his gross receipts.

87.    On or about the dates listed below, in the District of Massachusetts and elsewhere,

### STEVEN A. MILKIEWICZ,

defendant herein, being a resident of Scituate, Massachusetts, did willfully make and subscribe joint United States Individual Income Tax Returns, Form 1040, on behalf of himself and his spouse, for the tax years set forth below, which were verified by written declarations that they were made under the penalties of perjury and were filed with the Director, Internal Revenue Service Center at Andover, Massachusetts, which said tax returns he did not believe to be true and correct as to every material matter in that adjusted gross income and joint taxable income were reported in the amounts listed, whereas, as he then and there well knew and believed, adjusted gross income and joint taxable income for each of the tax years substantially exceeded the amounts reported:

| Count | Date Filed | Tax Year | Adjusted Gross Income | Joint Taxable Income |
|-------|-----------|----------|----------------------|---------------------|
| 17 | 11/19/98 | 1997 | $87,327.00 | $48,618.00 |
| 18 | 8/15/99 | 1998 | $82,800.00 | $40,955.00 |
| 19 | 8/17/00 | 1999 | $73,603.00 | $37,402.00 |
| 20 | 8/17/01 | 2000 | $99,205.00 | $53,466.00 |
| 21 | 10/18/02 | 2001 | $149,816.00 | $115,248.00 |

All in violation of Title 26, United States Code, Section 7206(1).

## SENTENCING ALLEGATIONS

THE GRAND JURY CHARGES THAT:

88.    With respect to Counts 1-9 of the Indictment the offense and the acts and
omissions that each defendant committed, aided, abetted and willfully caused, that were
reasonably foreseeable to each defendant and that were part of the same course of conduct and
common scheme:

    a.    caused loss greater than $200,000, as described in U.S.S.G.
          §2B1.1(b)(1)(F); and

    b.    as to defendant SCHROEDER, involved an abuse of a position of public
          trust in a manner that significantly facilitated the commission and
          concealment of the offense, as described in U.S.S.G. §3B1.3.

89.    With respect to Counts 10-11 of the Indictment, the offense and the acts and
omissions that each defendant committed, aided, abetted and willfully caused, that were
reasonably foreseeable to each defendant and that were part of the same course of conduct and
common scheme:

    a.    involved more than one bribe, as described in U.S.S.G. §2C1.1;

    b.    the payments exceeded $70,000, as described in U.S.S.G.
          §2C1.1(b)(2)(A);

    c.    the loss to the government from the offense exceeded $200,000, as
          described in U.S.S.G. §2C1.1(b)(2)(A);

    d.    the offense was committed for the purpose of facilitating the commission of
          another criminal offense, as described in U.S.S.G. §2C1.1(c)(1); and

    e.    as to defendant SCHROEDER, involved an abuse of a position of public
          trust in a manner that significantly facilitated the commission and
          concealment of the offense, as described in U.S.S.G. §3B1.3.

90.     With respect to Count 12 of the Indictment, the offense and the acts and omissions that defendant SCHROEDER committed, aided, abetted and caused, that were part of the same course of conduct and common scheme:

     a.     caused loss greater than $120,000, as described in U.S.S.G. §2B1.1(b)(1)(F); and

     b.     involved an abuse of a position of public trust in a manner that significantly facilitated the commission and concealment of the offense, as described in U.S.S.G. §3B1.3.

91.     With respect to Counts 13-16 of the Indictment, the offense and the acts and omissions that defendant SCHROEDER committed, aided, abetted and willfully caused, that were part of the same course of conduct and common scheme:

     a.     the tax loss was greater than $30,000, as described in U.S.S.G. §2T4.1(E); and

     b.     defendant SCHRODER failed to report and to correctly identify the source of income exceeding $10,000 per year from criminal activity, as described in U.S.S.G. §2T1.1(b)(1).

92.     With respect to Counts 17-21 of the Indictment, the offense and the acts and omissions that defendant MILKIEWICZ committed, aided, abetted and willfully caused, that were part of the same course of conduct and common scheme:

     a.     the tax loss was greater than $80,000, as described in U.S.S.G. §2T4.1(F); and

     b.     defendant MILKIEWICZ failed to report and to correctly identify the source of income exceeding $10,000 per year from criminal activity, as described in U.S.S.G. §2T1.1(b)(1).

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney


DISTRICT OF MASSACHUSETTS          December 14, 2004

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk

@ 11:00 A.M.

-21-

JS 45 (5/97) - (Revised USAO MA 1/15/04)

**Criminal Case Cover Sheet**                                    **U.S. District Court - District of Massachusetts**

**Place of Offense:**   Boston          **Category No.** II                **Investigating Agency** IRS FBI

**City**   Boston                        **Related Case Information:**

**County**   Suffolk                     Superseding Ind./ Inf.   x          Case No.   04-cr-10339-PJB
                                         Same Defendant   x          New Defendant   NH 04-cr-10339-136
                                         Magistrate Judge Case Number
                                         Search Warrant Case Number
                                         R 20/R 40 from District of

**Defendant Information:**

Defendant Name   TIMOTHY P. SCHROEDER              Juvenile   ☐ Yes   ☒ No

Alias Name

Address   18 Palmer Avenue, Plymouth, MA 02360-5828

Birth date (Year only):   1949   SSN (last 4 #):   6629   Sex  M  Race:   White          Nationality:   USA

**Defense Counsel if known:**   William Brown        **Address:** 31 Milk Street
                                                     Boston, MA 02109

Bar Number:

**U.S. Attorney Information:**

AUSA  Paul G. Levenson                   Bar Number if applicable  553946

**Interpreter:**   ☐ Yes ☒ No        List language and/or dialect:

**Matter to be SEALED:**   ☐ Yes  ☒ No

   ☐ Warrant Requested        ☒ Regular Process        ☐ In Custody

**Location Status:**

Arrest Date:   n/a

☐ Already in Federal Custody as                    in
☐ Already in State Custody                   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by  Judge Markwood    on  12/2/2004

**Charging Document:**   ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:**   ☐ Petty          ☐ Misdemeanor          ☒ Felony   14

Continue on Page 2 for Entry of U.S.C. Citations

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

Date:  December 14, 2004        Signature of AUSA:

**℀JS 45 (5/97) - (Revised USAO MA 1/15/04)**

<u>**Criminal Case Cover Sheet**</u>                    <u>**U.S. District Court - District of Massachusetts**</u>

**Place of Offense:** <u>Boston</u>          **Category No.** <u>II</u>          **Investigating Agency** <u>IRS FBI</u>

**City** <u>Boston</u>                    **Related Case Information:**

**County** <u>Suffolk</u>                Superseding Ind./ Inf. <u>x</u>            Case No.  <u>04-cr-10339-PJB</u>
                                        Same Defendant _____ New Defendant <u>x</u> <u>Nt'l 04-cr-10339 PJB</u>
                                        Magistrate Judge Case Number _____
                                        Search Warrant Case Number _____
                                        R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  <u>STEVEN A. MILKIEWICZ</u>            Juvenile  ☐ Yes  ☒ No

Alias Name  _____

Address  <u>119 Summer Street, Scituate, MA 02066-3109</u>

Birth date (Year only):  <u>1956</u>  SSN (last 4 #):  <u>3337</u>  Sex <u>M</u>  Race:  <u>White</u>        Nationality:  <u>USA</u>

**Defense Counsel if known:**  <u>Bruce A. Singal, Esq.</u>          **Address:** <u>1 Beacon Street</u>
                                                              <u>Boston, MA 02108</u>
Bar Number:  _____

**U.S. Attorney Information:**

AUSA <u>Paul G. Levenson</u>                    Bar Number if applicable  <u>553946</u>

**Interpreter:**      ☐ Yes ☒ No          List language and/or dialect:  _____

**Matter to be SEALED:**    ☐ Yes    ☒ No

    ☐ Warrant Requested        ☒ Regular Process        ☐ In Custody

**Location Status:**

Arrest Date:      <u>n/a</u>

☐ Already in Federal Custody as  _____  in  _____
☐ Already in State Custody  _____  ☐ Serving Sentence  ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by  _____  on

**Charging Document:**    ☐ Complaint      ☐ Information      ☒ Indictment

**Total # of Counts:**    ☐ Petty _____  ☐ Misdemeanor _____  ☒ Felony  <u>14</u>

Continue on Page 2 for Entry of U.S.C. Citations

☒        **I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
        accurately set forth above.**

Date:  December 14, 2004          Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    STEVEN A. MILKIEWICZ _____

### U.S.C. Citations

| | **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
|---|---|---|---|
| Set 1 | 18 U.S.C. §371 | Conspiracy to Defraud United States | 1 |
| Set 2 | 18 U.S.C. § 287 | False Claims Against the United States | 2-9 |
| Set 3 | 18 U.S.C. § 201 | Bribery of Public Official | 11 |
| Set 4 | 26 U.S.C. § 7206(1) | Filing False Tax Returns | 17-21 |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*

UNITED STATES OF AMERICA           \*

                                 \*   CR.04-213-01-PB

               v.               \*   January 3, 2005

                                 \*   11:00 a.m.

TIMOTHY SCHROEDER                \*

                                    \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF CHANGE OF PLEA
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government:     Paul G. Levenson, AUSA
                           U.S. Attorney's Office
                           1 Courthouse Way, Suite 9200
                           Boston, MA  02210

For the Defendant:      William A. Brown, Esq.
                           31 Milk Street, Suite 501
                           Boston, MA  02109

For Probation:         Cathy Battistelli

Court Reporter:        Diane M. Churas, CSR, RPR
                           Official Court Reporter
                           U.S. District Court
                           55 Pleasant Street
                           Concord, NH   03301
                           (603) 226-8829

COPY

```
 1                    BEFORE THE COURT

 2            THE CLERK:  Court is now in session and has

 3    for consideration this morning a change of plea in

 4    Criminal Case No. 04-10339-PB and 04-213-01-PB, United

 5    States of America versus Timothy Schroeder.

 6            THE COURT:  All right.  A couple of

 7    preliminary matters.  First, the parties asked to have

 8    the plea colloquy here in New Hampshire rather than in

 9    Massachusetts.  I'm willing to do that, but what I would

10    propose to do is to have the plea colloquy here, but to

11    withhold making the finding of guilt until the time of

12    sentencing and to do the sentencing in the District of

13    Massachusetts.

14            My reasoning for this is that it could be

15    argued that under the Rules of Criminal Procedure the

16    trial in this case has to take place in the district

17    where the crime occurred unless the case is formally

18    transferred to another district.  We are not

19    transferring that case from the District of

20    Massachusetts to the District of New Hampshire.

21    Therefore, it seems to me that if there were to be a

22    trial in this case, it would have to take place in the

23    District of Massachusetts.  That being the case, it

24    would seem to me that an argument could be made at least

25    that where someone waives their right to trial and is
```

1   adjudged guilty based upon a guilty plea, that that

2   determination of guilt should also take place in the

3   District of Massachusetts.

4          I have, though, in other cases where I have

5   taken pleas in cases where I'm sitting by designation in

6   other districts, have allowed parties to come to court

7   for the plea colloquy.  So what I propose to do is go

8   through the plea colloquy, make whatever findings I need

9   to short of a finding of guilt, to withhold the

10  adjudication of guilt until the time of sentencing, and

11  to make the guilty finding immediately prior to the

12  sentencing hearing, which I will conduct in the District

13  of Massachusetts.

14         Does anybody have any thoughts about what I am

15  proposing to do or any concerns that they want to raise

16  with me?

17         MR. BROWN:  No, your Honor.  In fact, when I

18  discussed this with your clerk, I was mindful that I'm

19  so old that I practiced before Judge Garrity on numerous

20  occasions in the District of Massachusetts, and his

21  universal practice was to go through the plea colloquy

22  and withhold acceptance of the plea until sentencing.

23  So I'm very familiar with this procedure.

24         THE COURT:  I routinely do that in 11(e)(1)(C)

25  pleas anyways because I can't really make a judgment in

1    my view about the plea agreement until I see the
2    presentence report.  So I do that even in cases that
3    arise in this district when there's an 11(e)(1)(C) plea.
4    Although this is a so-called naked plea, it still seems
5    to make sense to me to withhold the finding of guilt
6    until the time of trial.
7            Let me ask the government.  Do you have any
8    concerns?
9            MR. LEVENSON:  No, your Honor.  Actually, I
10   was unaware that the Court had been told that the
11   parties had requested this.  I simply received notice
12   that we had a hearing here.  So I'm a little new to the
13   arrangement.  I had assumed we were here because of the
14   obvious convenience to the Court, which I'm certainly
15   happy to oblige.
16           THE COURT:  No, I would have been perfectly
17   happy to come down to the district.
18           MR. LEVENSON:  No, I was not informed or
19   conferred with in connection with this; so I will come
20   where I'm called and I'm happy to be here.
21           THE COURT:  Our magistrate judge has gone down
22   to Massachusetts, as you know.
23           MR. LEVENSON:  Yes, several times.
24           THE COURT:  And I would plan to do the same
25   thing unless the parties suggested to me -- it was

1  presented to me by the clerk that the parties wanted

2  this.  So I assume there's some mix-up in communication,

3  but that's what I was told.  That's why I'm here instead

4  of in the District of Massachusetts.

5          All right.  In any event, I will go through

6  this -- since you're here and no one is opposing it, go

7  through the plea colloquy now.

8          MR. BROWN:  Your Honor, may I just briefly

9  state at the outset, that the indictment has certain,

10 what I consider to be, Blakely type issues.

11         THE COURT:  That's going to be the second

12 question I want to raise with you.  Let me explain my

13 concerns and then we can talk about how to best deal

14 with it.  Anything else, though, on the decision to do

15 the plea here versus in the District of Massachusetts?

16         MR. LEVENSON:  No, your Honor.

17         MR. BROWN:  No, your Honor.

18         THE COURT:  All right.  And I will ask your

19 client at the appropriate time if he waives any right he

20 may have to insist that the plea colloquy occur in the

21 District of Massachusetts, and I would expect, given the

22 desire at least of the defendant to do it here, that

23 he's prepared to waive any right he may have.

24         MR. BROWN:  He is, your Honor.

25         THE COURT:  Now let's talk about the so-called

 1   <u>Blakely</u> issues.  I have not done a naked plea post-
 2   <u>Blakely</u>, and at least it would seem to me preliminarily,
 3   that what the defendant must be prepared to admit today
 4   are the facts pleaded in each count of the indictment.
 5   It is not clear to me in order to plead guilty to an
 6   offense that he must also waive any so-called <u>Blakely</u>
 7   rights that he may have, nor does it therefore seem
 8   necessary to me that he be prepared today to admit any
 9   facts that are identified as sentencing facts.

10           If he's prepared to admit those facts today,
11   that's fine, but I -- at least my preliminary view would
12   be that he need not accept those facts in order to plead
13   guilty to the charges.  As long as he is prepared to
14   admit the facts pleaded in each count of the indictment
15   that form the factual basis for the conviction, if he
16   wanted to, he could reserve his right to challenge other
17   facts that aren't necessary to prove his conviction and
18   preserve his right to challenge those facts at the time
19   of sentencing.  But that's at least my preliminary view,
20   and I'm interested in what reactions you have.

21           MR. BROWN:  That's exactly what I rose to
22   bring to the Court's attention.  He specifically
23   reserves the right under <u>Blakely</u> to challenge the
24   Sentencing Guidelines, one, and to challenge any
25   sentencing enhancements, two.  But he intends to admit

1  to the facts as alleged which make up the character of

2  each of the offenses charged.

3          THE COURT:  I will ask him about that.  It's

4  very important to me that if the defendant is interested

5  in pleading guilty, that he is, in fact, able to admit

6  to all of the facts which are necessary to establish the

7  elements of each offense, and so as long as he's

8  prepared to admit to those facts, he can, as far as I'm

9  concerned, reserve his right to assert any challenge

10 that he might want to make on Blakely grounds to what

11 happens at sentencing, and he does not have to admit

12 today any facts that are not necessary for conviction on

13 any of the counts that he's pleaded guilty to.

14         MR. BROWN:  That's correct, your Honor.  And

15 he specifically, again, for the record, reserves his

16 rights under Blakely.  Thank you, your Honor.

17         THE COURT:  And what's your position on this?

18         MR. LEVENSON:  Obviously this is unchartered

19 territory for all of us, but assuming that guilt is

20 still determined by the elements of the offense, it

21 makes sense to me that we establish guilt first and then

22 proceed to sentencing in hopes that perhaps before

23 sentencing, we may know what the law of sentencing is

24 with respect to burden of proof and form of proof

25 required for sentencing factors and how they apply.  We

1    can hope that the Supreme Court will bail us out in the

2    interim, but at least for the present, it makes sense to

3    me to proceed with the adjudication or at least the

4    colloquy to establish guilt of the elements of the

5    offenses.

6            THE COURT: All right. And indeed, I wouldn't

7    see any advantage to this defendant to plead guilty now

8    if he wasn't preserving his Blakely rights. He isn't

9    required to plead guilty now. The case isn't scheduled

10    for trial right away. He could wait and see what the

11    Supreme Court does in the Booker and Fanfan cases, and

12    he probably would be well advised to do that unless he

13    were, as he's doing here, preserving his Blakely

14    argument. So I think it's entirely understandable that

15    defense counsel would want to preserve Blakely issues

16    given the current uncertainty that we're dealing with

17    with respect to Blakely matters.

18            All right. Those are the two preliminary

19    things that I wanted to discuss. Is there anything

20    else? I will start the plea colloquy as I ordinarily

21    would unless there are other things you wish to discuss.

22            MR. LEVENSON: One other preliminary matter.

23    The defendant made an initial appearance and was

24    arraigned on an original indictment. This is a

25    superseding indictment to which he has not yet been

1   arraigned.

2           THE COURT:  All right.  What additional

3   procedures do I need to follow here since I don't

4   ordinarily do arraignments?  You can advise me.

5           MR. LEVENSON:  We would need to ensure that

6   the defendant has been informed of the charges in the

7   indictment, that he waives the reading of the

8   indictment, that he is aware of the maximum offenses

9   associated with those charges, and ordinarily the Court

10  would enter a plea of not guilty on his behalf in the

11  ordinary course of an arraignment.

12          THE COURT:  Where I combine an arraignment

13  with the guilty plea, it would seem that most of those

14  things would be encompassed by the ordinary plea

15  colloquy.

16          MR. LEVENSON:  I believe they will be.  I've

17  never actually addressed the issue of an arraignment

18  reserved to the time of plea requiring a separate

19  procedure, other than I believe the defendant has to be

20  -- I think we do have to say something on the record to

21  indicate that the defendant has been formally notified

22  of the charge and waives the reading of the indictment.

23          THE COURT:  Well, you listen to the plea

24  colloquy, and if I miss anything that you think needs to

25  be covered, please feel free to step up and tell me what

1    you think I need to do that I haven't done.

2              All right.  Mr. Schroeder, I have a 21-count

3    indictment here.  It's marked superseding indictment and

4    it was returned by the grand jury on December 14, 2004.

5    Have you seen that superseding indictment?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Have you read it and discussed it

8    with your attorney?

9              THE DEFENDANT:  Yes, I have, your Honor.

10             THE COURT:  Do you feel you understand it?

11             THE DEFENDANT:  Yes, I do, your Honor.

12             THE COURT:  It's my understanding that you

13   intend to admit your guilt to all of the charges against

14   you as set forth in the superseding indictment.  Is that

15   correct?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  I'm going to ask you a series of

18   questions and you need to give me oral answers to the

19   questions because what we say is being recorded.  You

20   also need to give me truthful answers to the questions,

21   and you will be placed under oath because if you give

22   any false answers to any questions that I ask you, you

23   could be subject to prosecution for perjury as a result

24   of your statements in this proceeding.  Do you

25   understand that?

1              THE DEFENDANT:  Yes, your Honor.

2              THE COURT:  All right.  I will direct the

3    clerk to place you under oath now.

4                   TIMOTHY SCHROEDER

5        having been duly sworn, testified as follows:

6              THE COURT:  You can be seated and remain

7    seated.  If you don't understand something I'm saying to

8    you, interrupt me and ask me to explain it.  Do you

9    understand?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  How far did you go in school?

12             THE DEFENDANT:  High school.

13             THE COURT:  Can you read all right?

14             THE DEFENDANT:  Yes.

15             THE COURT:  And have you ever been treated for

16   mental illness?

17             THE DEFENDANT:  Yes.

18             THE COURT:  What have you been treated for?

19             THE DEFENDANT:  Depression.

20             THE COURT:  And when was that?

21             THE DEFENDANT:  July 3rd, two and a half years

22   ago.

23             THE COURT:  And were you treated successfully

24   for that condition?

25             THE DEFENDANT:  Yes, I suppose so, yes.

```
 1              THE COURT:  Are you currently receiving any
 2    medication for that condition?
 3              THE DEFENDANT:  No.
 4              THE COURT:  Are you currently suffering from
 5    any symptoms of that condition which could affect your
 6    ability to think here, to advise your lawyer, to assist
 7    your lawyer, and to understand the charges against you?
 8              THE DEFENDANT:  No, your Honor.
 9              THE COURT:  Are you taking any medication at
10    all or are you under the influence of drugs or alcohol?
11              THE DEFENDANT:  No, your Honor.
12              THE COURT:  Now, you have not been formally
13    arraigned on this superseding indictment.  Let me just
14    go over a couple of preliminary matters concerning the
15    issue of arraignment.  This is a new indictment.  It
16    supersedes, as it says, the prior indictment on which
17    you were arraigned.  Do you understand that?
18              THE DEFENDANT:  Yes, your Honor.
19              THE COURT:  As was the case with resepct to
20    that indictment, you have a right to be represented by
21    counsel on this -- in defending these charges against
22    you as set forth in the superseding indictment.  If you
23    can't afford counsel, counsel will be appointed for you
24    at no cost.  Do you understand that?
25              THE DEFENDANT:  Yes, your Honor.
```

1    THE COURT:  And as was the case when you were

2    originally arraigned, you have a right to remain silent.

3    You do not have to say anything about these charges.  If

4    you do decide to speak at any time, you can stop at any

5    time.  You can have your attorney be present with you

6    when you make any statements.  However, if you do make

7    any statements about these matters, they can be used

8    against you in prosecution.  Do you understand that?

9    THE DEFENDANT:  Yes, your Honor.

10    THE COURT:  Now, you have a right to have a

11    trial on these charges.  Do you understand that?

12    THE DEFENDANT:  Yes, your Honor.

13    THE COURT:  At that trial you would not have

14    to prove your innocence.  Instead the prosecution would

15    have to prove your guilt beyond a reasonable doubt with

16    respect to each element of each of the charges against

17    you in order fo

18    charges.  Do you understand that?

19    THE DEFENDANT:  Yes, your Honor.

20    THE COURT:  Now, you have told me that you've

21    read the indictment and you have discussed it with your

22    attorney and you feel you understand it.  I will have

23    the indictment read again in open court if you want, but

24    I won't have it read unless you want me to have it read.

25    Do you want me to have the indictment read to you?

1          THE DEFENDANT:  No, thank you.

2          THE COURT:  Let's go through the indictment

3   and review the charges against you briefly.  Count 1 of

4   the indictment charges you with the offense of

5   conspiracy.  The elements of the offense of conspiracy

6   are as follows.

7          And let me first ask you, before I do that, I

8   have asked the clerk to present you with an

9   acknowledgement and waiver of rights form to be used in

10  this district when someone pleads without a plea

11  agreement.  You have signed that form today.  Did you

12  read that form and review it with your attorney?

13         THE DEFENDANT:  Yes, I did.

14         THE COURT:  And do you feel you understand

15  that form?

16         THE DEFENDANT:  Yes, I do.

17         THE COURT:  I also have -- and I don't know

18  whether you've seen these or not -- summaries which I

19  assume were prepared by the prosecution in this case

20  which purport to be the elements of each offense set

21  forth in the indictment and the possible punishment for

22  each offense set forth in the indictment.  Have you seen

23  those documents?

24         THE DEFENDANT:  Yes, I have, your Honor.

25         THE COURT:  And have you read them and

1   discussed them with your attorney?

2           THE DEFENDANT:  Yes, I have.

3           THE COURT:  Do you feel you understand them?

4           THE DEFENDANT:  Yes, I do.

5           THE COURT:  So I will just be reviewing these

6   with you, but I will go through and review the elements

7   with you as to each of the charges.

8           As described in the documents you've been

9   provided with, the elements of conspiracy are, first,

10  that a conspiracy or agreement as specified in the

11  indictment existed between at least two persons.

12  Second, that the purpose of the conspiracy was to

13  defraud the United States or an agency thereof.  Third,

14  that you must have willfully joined in that agreement,

15  and fourth, that one of the conspirators committed an

16  overt act in an effort to further the purposes of a

17  conspiracy, and by willfully, what I mean is knowingly,

18  voluntarily, and intelligently joined in the agreement

19  with the purpose of accomplishing the conspiracy's

20  unlawful objectives.  Do you understand that those are

21  the elements of the conspiracy count against you?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Counts 2 through 9 of the

24  indictment charge you with individual counts of making

25  false claims against the United States.  The elements of

1   a false claims act count are described in the documents

2   you've been provided.  I will review the elements with

3   you.  The prosecution would have to prove with respect

4   to each false claims charge the following:

5           First, the prosecutor would have to prove that

6   you presented to a department or agency specified in the

7   indictment a claim against the United States.  Second,

8   he would have to prove that at the time the claim was

9   presented, the department or agency specified in the

10  indictment was a department or agency of the United

11  States.  Third, he would have to prove that the claim

12  presented was false, fictitious, and/or fraudulent as

13  charged in the indictment.  Fourth, the prosecutor would

14  have to prove that you knew that the claim was a false,

15  fictitious, or fraudulent claim, and finally, the

16  prosecutor would have to prove that the false,

17  fictitious, or fraudulent aspects of the claims was

18  material.

19          Do you understand that each of these things

20  would have to be proved by the prosecutor beyond a

21  reasonable doubt at trial in order for you to be found

22  guilty of any of the false claims charges?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Count 10 charges you with receipt

25  of bribery by a public official.  And it looks like

1    Count 11 also charges you with that offense.  Is that

2    right?  The conversions.

3                MR. LEVENSON:  Your Honor, Count 11 is the

4    obverse.  It has to do with the co-defendant's payment

5    of bribes.  So Mr. Schroeder is charged only in Count

6    10.

7                THE COURT:  So you are charged in Count 10

8    with receipt of bribery by a public official.  That

9    offense requires proof of the following.

10               MR. LEVENSON:  It's on the page labeled page

11   five of the copy I have here, beginning at the top.

12               THE COURT:  Okay.  Thank you.  The prosecutor

13   would have to prove, first, that you demanded, sought,

14   or received something of value as described in the

15   indictment.  Second, the prosecutor would have to prove

16   that at the time a public official of the United States

17   -- the prosecution would have to prove that you were at

18   the time a public official of the United States or

19   acting on behalf of the United States, and third, the

20   prosecutor would have to prove that you demanded,

21   sought, or received an item of value corruptly in return

22   for being influenced in the performance of any official

23   act.  Related to that, the prosecutor would have to

24   prove that you acted knowingly, voluntarily, and

25   intentionally.  Do you understand that these things

18

 1    would have to be proved beyond a reasonable doubt in

 2    order for you to be charged with the offense of receipt

 3    of bribery by a public official?

 4             THE DEFENDANT:  Yes, your Honor.

 5             THE COURT:  Count 12 charges you with

 6    embezzlement of public monies.  The elements of that

 7    offense are as follows:  First, the prosecutor would

 8    have to prove that the money or property contained in

 9    the indictment belonged to the United States Government

10    and had a value in excess of $100 at the time alleged.

11    Second, the prosecutor would have to prove that you

12    stole or converted such money or property for the

13    defendant's own use or for the use of another, and

14    third, the prosecutor would have to prove that you did

15    so knowing the money and property was not yours and with

16    the intent to deprive the owner of the use or benefit of

17    the money or property.  Do you understand that these are

18    the elements of the offense of embezzlement?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Counts 13 through 16 charge you

21    with the offense of filing false tax returns.  The

22    elements of that offense are as follows:  First the

23    prosecutor would have to prove that you made and

24    subscribed a tax return which was false as to a material

25    matter.  Second, he would have to prove that the return

1   contained a written declaration that it was made under

2   the penalties of perjury.  Third, he would have to prove

3   that you did not believe the return to be true and

4   correct as to every material matter, and fourth, he

5   would have to prove that you acted willfully with the

6   specific intent to violate the law.  Do you understand

7   that these are elements of the offense of filing false

8   tax returns as set out in Counts 13 through 16?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  17 through 21 apply only to

11   Milkiewicz?

12           MR. LEVENSON:  That's correct, your Honor.

13           THE COURT:  So have I covered all the charges

14   that this defendant is pleading guilty to?

15           MR. LEVENSON:  Yes, your Honor.

16           THE COURT:  Do you have any question about the

17   elements of the offenses to which you are pleading

18   guilty that you want to discuss with me?

19           THE DEFENDANT:  No, your Honor.

20           THE COURT:  I'm going to ask the prosecutor to

21   make an offer of proof describing the evidence that he

22   would use in prosecuting you.  Please listen to what he

23   says.  I will be asking you some questions about it when

24   he's done.  Go ahead, counsel.

25           MR. LEVENSON:  Your Honor, if this matter had

1    proceeded to trial, the prosecution's evidence would

2    have shown that Mr. Schroeder was employed for actually

3    nearly 20 years prior to 1997 as property and

4    procurement administrator for the clerk of court for the

5    United States District Court for the District of

6    Massachusetts.  The job title shifted over time, but

7    essentially his duties during that period involved

8    overseeing the purchasing of office supplies and at

9    various times furnishings and equipment for use of the

10   judges and the court in the United States District Court

11   in Massachusetts.  Over time Mr. Schroeder came to be

12   trusted and given, in effect, relatively unsupervised

13   control over his job responsibilities.

14          Beginning sometime in 1997, Mr. Schroeder

15   created a dummy company called MS & Associates which

16   ultimately was no more than a post office box and couple

17   of bank accounts and began, among other things, this

18   scheme of embezzlement whereby equipment was on the

19   papers purchased -- office supplies and equipment were

20   purchased from MS & Associates.  Checks were cut,

21   treasury checks on behalf of the court cut to MS &

22   Associates, and ultimately made their way into the bank

23   accounts that Defendant Schroeder controlled.

24          Over the course of the ensuing nearly five

25   years, some $180,000 worth of expenditures, normally for

1    office supplies for the court, were paid to MS &

2    Associates when, in fact, there were no goods delivered

3    in connection with that.  It was pure embezzlement.

4            In addition, beginning in around 1997,

5    Defendant Schroeder began the scheme that is described

6    in the conspiracy count of the indictment, which

7    essentially involved dealing with an individual named

8    Steven Milkiewicz who had himself a couple of office

9    supply companies, Jay Cameron Company and CJ Sales

10   Company, and with these two companies, Co-defendant

11   Milkiewicz did business with the court supplying office

12   supplies to the court.  Milkiewicz also at various times

13   represented other office supply and furnishing

14   companies.

15           The two entered into a social relationship and

16   a criminal relationship.  The criminal relationship

17   consisted in significant part of several separate but

18   related schemes.  One was a classic bid-rigging scheme.

19   With respect to many of the procurements for which Mr.

20   Schroeder was responsible, he was obligated to obtain

21   multiple bids or competitive price quotes to get

22   competitive quotes for supplying goods and services to

23   the court, and with Mr. Milkiewicz he knowingly colluded

24   in an arrangement where Mr. Milkiewicz submitted quotes

25   from multiple companies that Mr. Milkiewicz either

1   himself controlled or had an arrangement with.  In some

2   instances, Mr. Schroeder used his own dummy company, MS

3   & Associates, to supply a bid, thereby creating the

4   illusion of competitive bidding and price quoting for

5   the supplies for the court when in reality the contracts

6   were simply being given to Mr. Milkiewicz either

7   directly or indirectly producing inflated prices to be

8   paid by the court.

9          In connection with this, the arrangement

10  extended to, in fact, a cash kickback arrangement

11  whereby Mr. Milkiewicz would provide some share -- and

12  it's not clear how formalized the share was, but

13  somewhere between a third and a half of the excess

14  profits going to Mr. Schroeder in cash, simply hand

15  delivered.  Often at the time that checks to Mr.

16  Milkiewicz's companies were cut, Mr. Schroeder would

17  hand deliver the checks, and the two would often go out

18  drinking and spend an evening together, and in the

19  course of that process, Mr. Milkiewicz would kick the

20  cash back to Mr. Schroeder.

21         In total it appears to be nearly $178,000

22  worth of overcharges to the government resulted from

23  inflated bids as a result of this collusion.

24         In addition to this bid-rigging aspect of the

25  conspiracy, there's a second theft aspect of the

1    conspiracy in which on various occasions with Mr.

2    Schroeder's acquienscense -- and there are disputes

3    about who suggested what, but the fact was that

4    deliveries of large quantities of fungible goods; such

5    as, cartons of copy paper, the court would be billed

6    for, say, 500 cartons of copier paper and only 400 would

7    be delivered, yielding, again, excess profits and a

8    kickback to Mr. Schroeder.

9          As described in the indictment, there were

10   multiple overt acts which represent a sampling of the

11   course of conduct over a period of roughly five years.

12   I should say with respect to the goods that were not

13   delivered, the short deliveries, if you will, of copier

14   paper or of toner cartridges for copiers and printers,

15   we're talking another roughly $77,000 of value of goods

16   that simply were never delivered but were billed for.

17   The indictment describes and the evidence, if this had

18   gone to trial, would show, for example, in October of

19   1998 an instance of charging roughly a thousand dollars

20   for certain envelopes that had already been billed in a

21   previous month.

22          In December of '98 and January of '99, an

23   instance is described in the indictment and the evidence

24   would show how MS & Associates puts in a bid for an item

25   that is intentionally set to be not the winning bid

1  setting up the bid so that Mr. Milkiewicz won that

2  particular bid.

3          October 1999, there's a description of what

4  happened in that instance was $8,760 worth of copying

5  paper, 240 cartons, that simply were never delivered to

6  the court but were billed as if they had been.  There

7  were off-site warehouses and storage facilities for the

8  court to make it somewhat easier for deliveries to be

9  lost or certainly for track of the supplies to be lost

10  along the way and for these things to be overlooked in

11  the ordinary operation of the court.

12          Come January and February of 2000, $20,000

13  worth of toner cartridges for various printers and

14  copiers in the courthouse, of the 334 items that were to

15  be delivered, only 248 appear to have been actually

16  purchased and delivered to the court.  April 2000,

17  copier paper, 600 cartons ordered and paid for, 400

18  cartons delivered.  So it continues into June of 2000

19  with stationery, 20 cases of stationery are ordered for

20  roughly $5,760.  Only ten cases are delivered, yet it's

21  treated as a delivery in full and payment is made.

22  August 2000, same sort of arrangement, 500 cartons of

23  copier paper are purchased for $17,975.  Only 400

24  cartons are delivered.  September and October of that

25  year, 500 cartons ordered, 400 delivered.  September and

1    October of 2001, 400 cartons ordered, 300 delivered.

2    March and April of 2002, 400 cartons ordered again, 200

3    delivered.

4         The pattern becomes obvious, and what I've

5    described are simply instances that are described in the

6    indictment that we would have presented the evidence at

7    trial to show how those occurred.

8         The evidence would include, I should say,

9    evidence of admissions by Mr. Schroeder.  Mr. Schroeder

10   was first confronted in the summer of 2002.  After an

11   initial denial, he expressed great remorse and

12   ultimately, with counsel, met with investigators and

13   prosecutors and detailed his role and involvement in

14   this scheme, acknowledging his responsibility for it.  I

15   realize that's separate from the acknowledgement he

16   makes to the Court, but I think it's worth pointing out

17   to the Court that he has acknowledged his role in the

18   scheme from early on.

19        With respect to the false claims counts, each

20   of those parallels and the evidence would parallel what

21   I've just described and summarized, that series of

22   transactions.  So each of the eight false claims act

23   charges parallels one of the sets of overt acts in the

24   conspiracy charge.

25        With respect to the receipt of bribes, the

1   evidence, again, would show the payment of cash
2   kickbacks.  The evidence would show a review, among
3   other things, of bank accounts reflecting Mr.
4   Milkiewicz's withdrawals of cash, coinciding roughly
5   with his receipt of checks in connection with
6   fraudulently inflated bids or invoices, and likewise in
7   some instances, deposits of some of the cash to
8   corroborate Mr. Schroeder's acknowledgment of receiving
9   cash kickbacks.

10          With respect to Count 12, the evidence there
11  would be the MS & Associates evidence, the evidence
12  showing Mr. Schroeder's signing of the bank account
13  documentation and the post box registration information
14  that links Mr. Schroeder to MS & Associates and
15  establishes that MS & Associates was, in fact, no more
16  than a shell used for the embezzlement of funds from the
17  court.

18          And then with respect to Counts 13 through 16,
19  the evidence would show the filing of joint tax returns
20  by Mr. Schroeder and his wife for each of the tax years
21  from 1997 through the year 2000 and will show that the
22  amounts reflected as income on those tax returns were
23  fully accounted for by W-2 and other identified and
24  traced income and that there was no reporting of either
25  the embezzlement funds that were obtained through MS &

1   Associates, roughly $180,000 spread out over that

2   five-year period, nor was there any accounting in the

3   tax returns of the cash kickbacks which Mr. Schroeder

4   has estimated range between 15 and $30,000 per year cash

5   that, again, was not accounted for and not reported on

6   the tax returns.

7           So that in summary is the evidence that the

8   government would present had this matter gone to trial.

9           THE COURT:  I have one question for you and it

10  concerns the issue of internal controls.  How is this

11  scheme accomplished with the ordinary internal controls

12  one would expect; that the same person issues purchase

13  orders isn't the person that signs for items that are

14  received?  In this case was the defendant working both

15  ends of that transaction?

16          MR. LEVENSON:  To a significant degree.  For

17  the actual receipt of items, in many instances, what

18  I've noticed are that the invoices and delivery

19  instructions instruct the delivery people to contact Mr.

20  Schroeder.  So that as far as getting account coming in,

21  Mr. Schroeder would have been been personally in a

22  position to be doing the receiving on at least a

23  significant portion of the items.

24          As far as issuing of the checks, Mr. Schroeder

25  was not normally the person issuing the checks.  In each

1    instance he had to prepare a recquisition form that was

2    reviewed and signed by others.

3          THE COURT:  But he could accomplish the fraud

4    without the involvement of others as long as he was the

5    one that was issuing the purchase orders and certifying

6    that the items had been received.  At that point the

7    check issuer just uses documentation that he provides to

8    issue the check.

9          MR. LEVENSON:  Precisely.  So that there's no

10   suggestion of criminal collusion.  Obviously there's a

11   breakdown in the internal controls that reflects in

12   significant part the degree of trust that people

13   naturally fall into in the course of ordinarily

14   conducted business activity, be it a court or anywhere

15   elsewhere, where as the person responsible for the

16   ordering says, well, here's what we need next, and

17   passes the paperwork up the system.

18         THE COURT:  I think you answered my question.

19   The documentation that supports the charge suggests that

20   this defendant was involved both in the generation of

21   the purchase orders and in certifying receipt of the

22   items that allegedly had come in.

23         MR. LEVENSON:  Yes.

24         THE COURT:  Okay.  Thank you very much.  Mr.

25   Schroeder, have you heard what the prosecutor has said

 1    about the evidence against you?

 2          THE DEFENDANT:  Yes, your Honor.

 3          THE COURT:  Do you disagree with any of that

 4    evidence?

 5          THE DEFENDANT:  No, your Honor.

 6          THE COURT:  Are you pleading guilty to these

 7    charges because you are guilty of each of the charges?

 8          THE DEFENDANT:  Yes, your Honor.

 9          THE COURT:  Now, I mentioned at the beginning

10    of this hearing that, although I think the rules of

11    criminal procedure are not crystal clear on this point,

12    that you might have a right to have your guilt

13    adjudicated at a proceeding within the District of New

14    Hampshire.  I'm going to defer the adjudication of guilt

15    until I hold a sentencing hearing in this case which

16    will occur in the District of Massachusetts.  But to the

17    extent that you have any right to have this proceeding

18    or this part of the proceeding held in the district,

19    it's my understanding that you intend to give up your

20    right to have the proceeding held in the District of

21    Massachusetts and agree that it can be held here.  Is

22    that right?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Now, let me review the potential

25    punishments for the charges against you.  Again, these

1   are set forth in a document that was provided to you and
2   you've told me that you reviewed with your attorney, but
3   I will review the possible punishments again with you.
4          On the conspiracy charge, you face a possible
5   prison term of five years, a fine of $250,000 or twice
6   the gross gain resulting from the offense, a term of
7   supervised release of up to three years, and a $100
8   special assessment.  As is the case with all supervised
9   release charges, if you violate supervised release, you
10  could be sent back to prison.  Do you understand that's
11  the maximum possible penalty you face in the conspiracy
12  charge?
13         THE DEFENDANT:  Yes, your Honor.
14         THE COURT:  On the false claim count, each of
15  those, you face a possible prison term of five years,
16  again, a $250,000 fine or twice the gross gain resulting
17  from the offense, three years of supervised release, and
18  a $100 special assessment.
19         On Count 9, receiving bribes.
20         MR. LEVENSON:  Your Honor, I'm sorry to
21  interrupt, it's -- my typo is in this document.  That
22  would actually be -- Count 10 is the receipt of bribes.
23  My typo has made its way up to the Court.
24         THE COURT:  Thank you.  Count 10, the
25  receiving bribes by a public official, the charge

1    carries a possible prison term of up to 15 years in

2    prison, a $250,000 fine, or three times the amount of

3    the bribe, whichever is greater, three years of

4    supervised release, and a $100 special assessment.  Do

5    you understand that?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  You also understand that if I

8    haven't asked you, the penalties you face on the false

9    claim counts, Counts 2 through 9?

10             THE DEFENDANT: Yes, your Honor.

11             THE COURT:  Count 11 charges you with

12   embezzlement.  You face a possible prison term on the

13   embezzlement charge of up to ten years imprisonment and

14   a $250,000 fine or twice the gross gain resulting from

15   the offense, whichever is greater, three years of

16   supervised release, and a $100 special assessment.  Let

17   me make sure that that is the correct count.

18             MR. LEVENSON:  It's actually Count 12, your

19   Honor, and the last ones are 13 through 16.

20             THE COURT:  Okay.  Thank you.  Do you

21   understand that's the possible penalty you face on Count

22   12?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  On Counts 13 through 16,

25   subscribing false tax returns, you face a possible

1    prison term of three years on each count, $250,000 fine,

2    and twice the gross gain resulting from the offense, a

3    year of supervised release, and a $100 special

4    assessment.  Do you understand that's the potential

5    penalty you face?

6                THE DEFENDANT:  Yes, your Honor.

7                THE COURT:  In addition to that, you could be

8    required to pay restitution as a part of your sentence.

9    Do you understand that?

10               THE DEFENDANT:  Yes, your Honor.

11               THE COURT:  Now, by pleading guilty, you are

12   giving up certain constitutional rights you have.  I

13   want to review those rights with you now to make sure

14   you understand them.  As I mentioned, you have a right

15   to a trial on these charges.  At that trial there would

16   be twelve jurors.  All twelve jurors would have to find

17   that your guilt had been proved beyond a reasonable

18   doubt in order for you to be found guilty of any of the

19   charges.  You could be represented by counsel at no cost

20   to you if you couldn't afford counsel or counsel of your

21   choosing if you retained counsel.  You could testify at

22   that trial if you wanted to.  You could remain silent at

23   the trial.  If you chose to remain silent, I would tell

24   the jury that it could not hold your silence against you

25   in any way.  You could subpoena witnesses and have them

1    come to court and testify in your behalf.  You could be

2    present during the trial and have your lawyer

3    cross-examine all the witnesses who testified against

4    you.  You wouldn't have to put on any evidence.  The

5    burden would be entirely on the prosecutor to prove your

6    guilt beyond a reasonable doubt.  By pleading guilty,

7    you are giving up your right to a trial on these

8    charges.  If I accept your guilty plea, there won't be a

9    trial.  The only thing that will be left is for me to

10   sentence you.  Do you understand that?

11              THE DEFENDANT:  Yes, your Honor.

12              THE COURT:  Now, you've certified in this

13   acknowledgment form that you signed that there's no

14   agreement that you have with the government regarding

15   your possible sentence; is that correct?

16              THE DEFENDANT:  Yes, your Honor.

17              THE COURT:  Has anyone promised you anything

18   in an effort to try to get you to plead guilty?

19              THE DEFENDANT:  No, your Honor.

20              THE COURT:  Has anyone threatened you or any

21   member of your family in an effort to try to get you to

22   plead guilty?

23              THE DEFENDANT:  No, your Honor.

24              THE COURT:  Are you satisfied with the legal

25   advice you've received from your attorney?

```
 1              THE DEFENDANT:  Yes, your Honor.

 2              THE COURT:  Let me ask your counsel.  Have you

 3    advised your client concerning the admissibility of any

 4    statements or other evidence the government has against

 5    him?

 6              MR. BROWN:  I have, your Honor.

 7              THE COURT:  To your knowledge is he pleading

 8    guilty because of any illegally obtained evidence in the

 9    government's possession?

10              MR. BROWN:  No, your Honor.

11              THE COURT:  Do you know of any reason why I

12    should not accept his guilty plea?

13              MR. BROWN:  No, your Honor.

14              THE COURT:  All right.  Thank you.  All right,

15    sir.  This is the last chance you have to change your

16    mind.  Do you feel you've had enough time to think about

17    your decision to plead guilty?

18              THE DEFENDANT:  Yes, your Honor.

19              THE COURT:  And do you still wish to plead

20    guilty to the charges?

21              THE DEFENDANT:  Yes.

22              THE COURT:  All right.  And, again, you've

23    told me that you don't want to have the charges read to

24    you.  So what I will do in taking your guilty pleas is

25    simply ask you with respect to each of the counts.  I
```

1  will go through them as to each count and ask you to

2  tell me whether you plead guilty or not guilty to that

3  count.  All right?

4          So as to Count 1 of the indictment charging

5  you with conspiracy, how do you plead as to that count?

6          THE DEFENDANT:  Guilty.

7          THE COURT:  As to Counts 2 through 9, each

8  count charging you with making false claims against the

9  United States, how do you plead as to those counts?

10          THE DEFENDANT:  Guilty.

11          THE COURT:  As to Count 10 charging you with

12  receipt of bribery by a public official, how do you

13  plead as to that count?

14          THE DEFENDANT:  Guilty.

15          THE COURT:  With respect to Count 12 charging

16  you with embezzlement of public monies, how do you plead

17  with respect to that count?

18          THE DEFENDANT:  Guilty.

19          THE COURT:  With respect to Counts 13 through

20  16, each count charging you with the offense of filing

21  false tax returns, how do you plead as to those counts?

22          THE DEFENDANT:  Guilty.

23          THE COURT:  All right.  Having questioned the

24  defendant and his counsel on the offered pleas of

25  guilty, the defendant and his counsel having advised the

1    Court that they have conferred concerning the offered
2    pleas of guilty and all aspects of the charges against
3    the defendant and any defenses he may have, and the
4    Court having observed the defendant making his answers,
5    his demeanor and manner while answering questions, his
6    apparent intelligence and his attitude, and the Court
7    having observed that the defendant does not appear to be
8    under the influence of any medication, drug, or other
9    substance which may affect his judgment in any manner,
10   the Court finds that the offered pleas of guilty have a
11   factual basis, are free of any coercive influence of any
12   kind, are competently and voluntarily made with full
13   knowledge of the charges against him and the
14   consequences of his pleas, that there have been no
15   promises of any kind made to him and no threats or
16   coercion have been exerted upon him in any manner.

17            I will defer acceptance of the plea until the
18   time of sentencing.  We've set a sentencing date.  Have
19   you conferred with the clerk's office in Massachusetts?
20   Do we need to talk to them?

21            THE CLERK:  I'm not sure I need to talk them.
22            THE COURT:  Unless you hear differently from
23   us, sentencing will take place in the District of
24   Massachusetts on April 4 at 10:30.  Parties should
25   consult local rules of the District of Massachusetts for

1   other dates bearing on the sentencing process.

2              The presentence report and the investigation

3   will be conducted by the probation office in this

4   district, and you should direct your communications to

5   the probation officer.  Are you doing it, Ms.

6   Battistelli?

7              MS. BATTISTELLI:  Yes, your Honor.

8              THE COURT:  Ms. Battistelli will be the

9   probation officer assigned to the case.  You can

10  communicate with her regarding the preparation of the

11  report.

12             All right.  Let me ask the government, is

13  there any reason to alter the defendant's conditions of

14  release?

15             MR. LEVENSON:  No, your Honor.

16             THE COURT:  All right.  I will maintain those

17  conditions of release in place pending the time of

18  sentencing.  Did I miss anything that we needed to cover

19  from the arraignment on the superseding indictment?

20             MR. LEVENSON:  No, your Honor.

21             THE COURT:  Is there anything else that we

22  need to cover today?

23             MR. BROWN:  Nothing further, your Honor.

24             (Adjourned at 11:50 a.m.)

25

38

1

2                    C E R T I F I C A T E

3

4          I, Diane M. Churas, do hereby certify that the

5   foregoing transcript is a true and accurate

6   transcription of the within proceedings, to the best of

7   my knowledge, skill, ability and belief.

8

9                    _____
                     DIANE M. CHURAS, CSR, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# HOLTZ & REED, LLP
### 25 NEW CHARDON STREET
### BOSTON, MASSACHUSETTS 02114

HERBERT L. HOLTZ
GERALD A. MCDONOUGH
THOMAS A. REED
JAMES SCHUH

OF COUNSEL:
MATTHEW A. CAFFREY
THOMAS P. SMITH

August 17, 2005

Ms. Michelle Peirce, Esq.
Donoghue Barrett & Singal
One Beacon Street
Boston, Massachusetts 02108
*(via facsimile to 617.720.5092)*

Re: <u>United States</u> v. <u>Schroeder et al</u>.

Dear Michelle:

      This letter follows up our conversations and exchange of emails concerning the documents requested in your subpoena, directed to the office of the Clerk of Court, and dated July 29, 2005. Without waiving any request you made in that subpoena, you have asked for selected documents, a subset of your original request. The Office of the Clerk of Court has studied your requests, and this is its response.

      First, as to the documents originally requested, I confirm that the Clerk of Court's office has searched for documents responsive to Schedule A, item 4 of your subpoena. Responsive documents will be provided to you by next week. I also confirm the office has searched for documents responsive to item 7; again, responsive documents will be produced to you by next week. (Please note that Mr. Schroeder's work attendance records do not seem to be available for 1995, but only from 1996 and after.)

      Second, as to your request for selected documents, in your email dated August 11, 2005, you have follow-up notes concerning the nine items set out in Schedule A to your subpoena. I will follow your numbered requests in your August 11 email here. (1): To the extent documents are available, the office of the Clerk of Court will search for and produce documents, as specified, concerning entries 2, 3, 4, 38-40, 83, 84, 86, 88, 102, 152, and 153 from your subpoena's Exhibit 1. (2): The office has already produced responsive documents concerning Tracey Sales (some having been seized from Mr. Schroeder's office as well). Many of the items you request are unavailable due to their age; but responsive documents not already produced concerning Tracey Sales (meaning chiefly vouchers), will be searched for and produced. A & G Sales is not a vendor familiar to the Clerk's office. New England Office Supply has received over 600 payments in the relevant period; and it is unduly burdensome to search out each one of those, and the underlying documentation. You have asked if the office can run a search concerning payments to NEOS, and print out and produce the result. I will respond to

your request as soon as I am able to. (3): You have emphasized yours is a continuing request. (4): See paragraph above. (5) and (6): Information on the JNET is, I believe, confidential and proprietary. Requests concerning the contents of the JNET should, or so I think, be directed to the Administrative Office. In any case, the office of the Clerk of Court would not disclose the contents of the Court's intranet system without approval of the Administrative Office or order of court. More pertinently, the intranet version of the Guide replaced some 20 volumes of material. Collecting and printing out all the material is unduly burdensome. Further, superseded versions of the Guide (namely the updating bulletins you request) are not, to the information and belief of the Clerk's office, available on the JNET. (7): See above paragraph. (8) and (9): As I explained to you on the telephone, the Clerk's office cannot run summaries for purchases by, e.g., selecting for the Peabody probation office. The documents noted in this paragraph as being ones the Clerk's office will search for and produce will be provided to you by next week.

Sincerely yours,

Thomas A. Reed

Thomas A. Reed