UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10339-PJB |
| | ) | NH CR04-213-01-PB |
| TIMOTHY P. SCHROEDER and | ) | |
| STEVEN A. MILKIEWICZ, | ) | |
| | ) | |
| Defendants. | ) | |

### SENTENCING MEMORANDUM OF STEVEN MILKIEWICZ

Defendant, Steven Milkiewicz, files the following Sentencing Memorandum setting forth all factors that the Court should, and should not, consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

The government's recommendations, adopted in part by the PSR, go well beyond the charges of which Mr. Milkiewicz was found guilty, and well beyond any evidence available to support these excessive recommendations. Indeed, as outlined below, the government's positions appear geared more toward punishing Mr. Milkiewicz for going to trial than for the offenses of which he was convicted. Indeed, the government even attributes a higher loss number to Mr. Milkiewicz than to Mr. Schroeder for the very same conspiracy. More importantly, the government's recommendation, and the PSR, create a situation where Mr. Milkiewicz will be punished more harshly than his more culpable codefendant, Timothy Schroeder, the insider who

plead guilty to (1) a separate scheme unrelated to Mr. Milkiewicz of embezzling $180,000 from the Clerk's Office, and (2) bribery, a charge of which Mr. Milkiewicz was acquitted.

Thus, after setting forth the applicable law, including the law supporting application of a reasonable doubt standard for any facts relied on to increase Mr. Milkiewicz's sentence, this Memorandum discusses each of the factors to be considered under section 3553.

## ARGUMENT

### I.    Sentencing under Booker

A.    Guidelines are Only One of Several Statutory Factors and are Advisory Only

On January 12, 2005, the Supreme Court ruled that its Sixth Amendment holding in Blakely v. Washington, 124 S. Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466 (2000) applies to the Federal Sentencing Guidelines. United States v. Booker, 125 S. Ct. 738, 756 (2005). Accordingly, reaffirming its holding in Apprendi, the Court concluded that, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 756.

The key goal under Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

1)    "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1);

2)    "the kinds of sentences available" (§ 3553(a)(3);

3)    "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6); and

4)    "the need to provide restitution to any victims of the offense." (§ 3553(a)(7)).

Booker and § 3553(a) make clear that courts may no longer uncritically apply the guidelines. Doing so is "inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore." United States v. Ranum, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. 2005) (Adelman, J.). As another district court judge has correctly observed, any approach which automatically gives "heavy" weight to the guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in Booker." United States v. Jaber., 362 F. Supp. 2d 365, 371 (D. Mass. 2005); see also United States v. Ameline, 400 F.3d 646, 655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence"), reh'g en banc granted, 401 F.3d 1007 (9ʰ Cir. 2005); see also Booker, 125 S. Ct. at 791 (Scalia, J., dissenting in part). Likewise, if the remedial majority thought the guidelines had to be given "heavy weight," its opinion would have said so. The remedial majority clearly understood that giving any special

weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth

Amendment.

In sum, in every case, a sentencing court must now consider all of the § 3553(a) factors,

not just the guidelines, in determining a sentence that is sufficient but not greater than necessary

to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors

set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines.

See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part,

dissenting in part) (arguing that since § 3553(a) requires sentence be no greater than necessary to

meet four purposes of sentencing, imposition of sentence greater than necessary to meet those

purposes violates statute and is reversible, even if within guideline range).


B.    The court must apply a "reasonable doubt" standard of proof

In light of Booker, the government must establish beyond a reasonable doubt sentencing

facts, such as loss numbers, that are extremely relevant to the sentence imposed. Booker ruled

that, under an advisory guideline system, judges may continue to find facts that increase a

sentence without offending the Sixth Amendment. See generally Booker, 125 S. Ct. 738.

Although the Court did not opine on the standard of proof required by the Fifth Amendment in

finding these facts, its analysis is telling. Justice Stevens' legal analysis begins by stating that

"[i]t has been settled throughout our history that the Constitution protects every criminal

defendant 'against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged.'" United States v. Booker and United

States v. Fanfan, 125 S. Ct. 738, 748 (quoting In re Winship, 397 U.S. 358, 364 (1970)). Justice

Thomas opined that "[t]he commentary to § 6A1.3 states that '[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of the case.' The Court's holding today corrects that mistaken belief." Booker, 125 S. Ct. at 798 n.6 (Thomas, J. dissenting).

In addition, persuasive case law from this District adopts a reasonable doubt standard in determining the amount of loss. United States v. Pimental, 367 F.Supp.2d 143, 153-54 (D. Mass 2005). In Pimental, the Court found that sentencing is now "a hybrid regime, neither fish (totally indeterminate) nor fowl (totally mandatory)." Id. at 154. "Certain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome. So long as they do, they should be tested by our highest standard of proof." Id. Although the Sixth Amendment's right to a jury trial is no longer implicated under an advisory system, the Fifth Amendment's Due Process requirement is still applicable. Id.

Regardless of what the First Circuit or Supreme Court will ultimately conclude is the appropriate burden of proof, sentencing courts should, in the meantime, "err on the side of caution to protect a criminal defendant's constitutional rights" and decline to "base any significant increase in a defendant's sentence on facts that have not been proven beyond a reasonable doubt." United States v. Huerta-Rodriguez, 355 F. Supp.2d 1019, 1027 & n.8 (D. Neb. 2005).

**II.    Application of the Statutory Sentencing Factors to Mr. Milkiewicz's Case**

The factors discussed below must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

A.    The History and Characteristics of the Offender

The trial showed only one side of Mr. Milkiewicz; a fuller picture is helpful and, as discussed above, relevant to the Court's decision. Mr. Milkiewicz grew up in the projects in Holyoke, Massachusetts. Mr. Milkiewicz had a "hard upbringing" where he, and his five siblings, shared a three-bedroom home. PSR, ¶ 56. His parents were second-tier immigrants who worked as factory workers to support the family. Id. Mr. Milkiewicz's brother, who is now a Special Agent for the Department of State, has submitted a letter on Mr. Milkiewicz's behalf describing the critical role Mr. Milkiewicz played in helping him overcome some of the obstacles created by their unfortunate family situation. See letters submitted on Mr. Milkiewicz's behalf attached as Exhibit 1. Mr. Milkiewicz's difficult upbringing also sheds light on, and mitigates, his minor criminal history, most of which was alcohol-related and (as discussed below) overstates his criminal history category.

Despite his challenging upbringing, Mr. Milkiewicz recognized the importance of education in changing his circumstances and, accordingly, worked to put himself through college. Since then, he has had a stable, twenty-year marriage and is raising two children, Jay and Cameron, both of whom are dependants and live at home. Perhaps Mr. Milkiewicz has not fully left behind his difficult past, but the distance he has traveled, and the family which relies on him, must be considered under 18 U.S.C. § 3553 in arriving at an appropriate sentence.

Moreover, his family situation – he is a parent of two dependents, ages sixteen and fourteen – is

equally relevant to the sentence that should be imposed here. Mr. Milkiewicz is an active and

proud father who plays an extremely involved and important role in his children's lives. See

PSR ¶ 60. The attached letters from many different people highlight Mr. Milkiewicz's

achievements as a father. The adolescent years are clearly critical ones for his children and it is

in no one's interest that they be deprived unnecessarily of both parents' attention for more than is

absolutely necessary to punish Mr. Milkiewicz for the crimes of which he was convicted.

Mr. Milkiewicz directs the Court to letters submitted on his behalf to give the Court a fuller

picture of Mr. Milkiewicz's strong family and community values. See Exhibit 1.

      B.     The Need for the Sentence Imposed To Promote Certain
            Statutory Objectives

      The statutory framework requires the sentence to address the following factors: (1) to

reflect the seriousness of the offense, promote respect for the law, and provide just punishment

for the offense, (2) to afford adequate deterrence to criminal conduct, (3) to protect the public

from further crimes of the defendant, (4) to provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner.

The 24-level range, at a criminal history category II, in the PSR is higher than needed to address

these four factors. That level creates a range of 57 to 71 months, or roughly four to six years.

While in no way minimizing the seriousness of the charges of which Mr. Milkiewicz was

convicted, that range is higher than necessary for punishment and for deterrence. Indeed, the

higher end of that range exceeds the statutory maximum for the individual crimes, a significant factor given that the crimes arise out of the same conduct.

Simply put, the goal of deterrence would be met by a significantly lower sentence. Moreover, returning Mr. Milkiewicz to his life, and to gainful employment, will expedite repayment of any fines and restitution.

C.    The Sentencing Range Established by the Sentencing Commission

As described in more detail below, the correct guideline range under the non-mandatory guidelines in an offense level of approximately 16, before factoring in the reasons discussed in this Sentencing Memorandum for going well below that number. Defendant emphasizes, though, that the Guidelines, as discussed above, are only one of several factors to be considered. This section sets forth the underlying analysis for this offense level under the advisory sentencing guidelines and responds to the PSR's contrary conclusions concerning the Guidelines component of the several statutory sentencing factors the Court is to consider. The PSR's guideline range in this case is being improperly inflated by (1) an exaggerated loss figure recommended by the government, and (2) inappropriate enhancements. The facts underlying these factors must be proven by the government beyond a reasonable doubt, as is discussed above. Regardless, the government cannot prove the facts underlying its proposed loss figure, and proposed enhancements, even under a lesser standard.

As discussed below, Defendant believes the appropriate measure of loss is $39,623, which is the amount paid to Mr. Milkiewicz for products he was found by the jury not to have delivered, based on the guilty findings for Counts 2 through 9, the false claims counts. A chart

summarizing the loss attributable to the undelivered products that form the basis of the false

claims counts is attached as Exhibit 2. At the most – assuming the Court disagrees with

Defendant on the profit issues discussed below – the loss is only the $39,623 plus the loss related

to New England Office Supply (NEOS) purchases (a maximum of $62,876.61), and Mr.

Milkiewicz still falls "more than $70,000" range of § 2B1.1 and not over $20,0000.

    The government vastly overreaches by advocating for amounts well beyond that, and well

beyond the supportable evidence. Specifically, the government seeks to penalize Mr. Milkiewicz

for each and every piece of business Mr. Milkiewicz did with the Clerk's Office (and, in some

cases, the government tries to go beyond the Clerk's Office) despite the more narrow allegations

of which he was convicted. The government's proposed loss figure for the non-tax counts

includes two distinct components, (1) profits on goods that all agree were delivered to the Court

as ordered, and (2) amounts received for goods not delivered.   These two components are

addressed respectively below, as is the tax loss figure.

    The PSR notes an alternative loss calculation for the two components above. The PSR

notes that the Court might opt to treat the "profit" side of the loss as $61,778.85 which is the

number the government states represents Mr. Milkiewicz's profit on all goods he purchased from

NEOS and resold to the Clerk's Office. PSR, ¶ 22.[1] Similarly, as an alternative to the "non-

delivery" component of the loss, the PSR suggests that the Court might consider reducing the

government's proposed figure of $146,191.32 by $6,279.25 (reflecting paper sales during a time

when one of Mr. Milkiewicz's paper vendors' files was incomplete) and by $24,116.25

---

[1]  That figure should be $68,876.61 as demonstrated in Defendant's exhibit referenced above and in the chart the government submitted with its objections to the PSR.

(reflecting the chairs sold to Probation that the government seeks to add to the loss calculation).

While the PSR observes that both alternatives exceed the key loss threshold of $200,000, it is

important to note that, under the more conservative threshold, it does so by only $1,690.92.

    After addressing the problems with the theory of loss proposed by the government, this

subsection addresses other guideline-related issues.

### (1)    Mr. Milkiweicz's profits cannot be treated as "loss"

    The government proposes a grossly exaggerated loss figure, which includes all profit Mr.

Milkiewicz made in his business transactions with the Court.  See Memorandum from Paul

Levenson to Cathy Battistelli ("Government's Submission"), dated September 30, 2005, attached

as Exhibit 3.  The PSR notes that the Court could adopt a more conservative approach of

including as loss only $61,778.85 of Mr. Milkiewicz's profits, which is the amount the

government claims is Mr. Milkiewicz's profits for all product Mr. Milkiewicz bought from

NEOS and resold to the Court.  As discussed further below, the case law makes clear that, under

the facts of this case, Mr. Milkiewicz's profit cannot be treated as loss. Moreover, even if the

Court accepts the PSR's alternative of looking only to profits from NEOS purchases that were

resold to the Clerk's Office, that figure must be limited to the crime charged and proven, namely

profit on (a) Clerk's Office purchases over $2,500 where (b) there was proof of "bid rigging."

    As an initial matter, the government's approach appears to be based on a bribery theory,

even though Mr. Milkiewicz was acquitted of bribery. By recommending that the Court treat

profit as "loss," the government, and the PSR, appear to rely on the bribery count's allegation

that bribes lead to Mr. Milkiewicz getting work he should not have gotten.  See Count 11

-10-

("...defendant herein, did, directly and indirectly, corruptly give, offer and promise to a public official things of value with intent to influence the official acts of the public official...."). But that is not what Mr. Milkiewicz was convicted of. In fact, there was testimony that Mr. Milkiewicz received a great deal of business from the Clerk's Office long before the conspiracy alleged.

Thus, it is simply inappropriate to treat all profit as a product of the conspiracy. The profit column on the government's charts represent the value of Milkiewicz's services of providing products that were indisputably delivered to the Clerk's Office. In so doing the government seeks to use "gain" as a substitute for loss, but it cannot make such a leap. Rather, the advising Guidelines state that gain shall be used "only if there is a loss but it reasonably cannot be determined." See §2B1.1, Application Note 2(B). The government repeated several times in its initial submission to Probation that it is "certain" that the bid-rigging resulted in inflated prices (See Government's Submission, pp. 4-5, 5, attached as Exhibit 3.) These unsupported assertions are not enough. The government must first prove that there was a loss on all of Mr. Milkiewicz's transactions with the Clerk's Office before it can use gain as a substitute for loss.

The government cannot do so. There is no evidence, absent perhaps NEOS, which is discussed below, that Milkiewicz price-gouged the Clerk's Office on products he delivered. Mr. Schroeder testified that he "insisted" that Mr. Milkiewicz's prices be in line with other vendors; he conceded on redirect that he made sure that Mr. Milkiewicz's prices were reasonable out of

self interest – to avoid detection of other crimes – but that does not take away from the reasonableness of those prices.[2] Thus, the testimony is that his prices were reasonable.

In fact, there is evidence that Milkiewicz provided competitive prices and even saved the court money. Perhaps the best example is a sale Milkiewicz brokered concerning a $13,267.50 conference table addressed during the trial; the Clerk's Office expected to pay $25,000 for such a table. See Exhibit 4. And, Mike Tracey of Tracey Sales testified that, when he put in one low quote, Mr. Schroeder gave him the job, supporting Mr. Milkiewicz's contention that Mr. Schroeder sought and received reasonable prices. Mr. Schroeder also testified about positive results Mr. Milkiewicz got for the Clerk's Office – such as the cheaper bar code labels Mr. Milkiewicz recommended and located, and vexing paper jam problem he solved; this testimony supports Mr. Milkiewicz's contention that, despite the crimes of which he is convicted, his work was not 100% tainted.

Treating profit as loss is particularly unfair here given the Court's ruling at the pretrial hearing (which hearing also addressed the Clerk's Office's Motions to Quash) denying Mr. Milkiewicz access to evidence he sought from the Clerk's Office to support that his prices were reasonable. As the Court will recall, the Clerk's Office moved to quash Mr. Milkiewicz's third party subpoenas seeking such evidence. At the August 30 hearing on the Clerk's Office's Motions, the Court ruled from the bench that it would not allow the government to produce evidence of price gouging as that allegation was not the basis for the government's charges. Accordingly, the Court concluded that Mr. Milkiewicz had no need for the documents he sought

---

[2] References to specific testimony are taken from undersigned counsel's notes taken at trial as transcripts are not available, except for that from Mr. Kelly's testimony, for which a transcript is available.

from the Clerk's Office to prove that his prices were reasonable, if not favorable. Having had no

evidence whatsoever at trial of "price gouging," and having denied Mr. Milkiewicz access to

evidence that would refute the price gouging allegations that support the PSR's loss

recommendation, it is unfair and a violation of Mr. Milkiewicz's Due Process rights to treat

profit as loss and enhance his sentence based on that figure.

Moreover, the government's approach to the loss gives no credit to the value of the

services Mr. Milkiewicz performed and the cost of his overhead and other expenses. See

§2B1.1, Note 2(E)(i) (2002)  (A fair market value of the property [received] and the services

rendered").[3]  In other words, Milkiewicz is entitled to a profit or the fair market value of his

services as a dealer of office supplies. The government accounts (in part) for the value of the

property it received (i.e. the wholesale cost paid by Milkiewicz) but it does not account,

whatsoever, for the cost of Milkiewicz's services/labor in acting as a supplier. The application

note mentions both the property and the services rendered, not just the property. Id. In addition,

the application note mentions the "fair market value," as opposed to the wholesale price (the

price paid by Milkiewicz) that the government uses to offset the losses. Id.

Therefore, Milkiewicz must be given credit for (1) the fair market value of the products

provided (not simply the wholesale value) and/or (2) his services/labor as a dealer. The

combination of these factors justify removing all calculations derived from the Price Difference

column, as "the victim has sustained no loss [in this category] because [it] received the services

for which [it] bargained, despite the fact that [it] received them [fraudulently]." United States v.

---

[3] This provision references goods and services provided prior to a crime's detection; that provision logically applies here.

Barnes, 125 F.3d 1287, 1291 (9th Cir. 1997) (sentencing court erred in failing to consider benefits defendant provided to plasma center while fraudulently impersonating a doctor).[4] In other words, the Clerk's Office received the services of an office supplies dealer, despite the fact that it received some of the services via fraudulent conduct. "[V]alue may be rendered even amid fraudulent conduct." Barnes, 125 F.3d at 1291. In Barnes, the Court remanded the case for a loss determination and opined that the victim sustained no loss because it received the services it sought. Id.

Even if the government can show beyond a reasonable doubt that Milkiewicz submitted false quotes for many of the non-false-claims transactions, it must also prove the specific loss that resulted. See United States v. Lara, 956 F.2d 994, 998 (10th Cir. 1992). The government cannot make such a showing. Lara also involved a false claim case where the defendant contractor falsified a subcontractor's bid, causing the government to pay the defendant an additional $20,969.85 reflecting the difference between the real, and inflated, bid. Lara, 956 F.2d at 998. The Court held that the proper measurement for loss is the difference between the authentic bids and the fraudulent bids. Lara, 956 F.2d at 998. The loss was not the defendant's profit for the transaction as a whole. In the present case, the government has not shown that Milkiewicz's fraudulent quotes caused the court to expend additional monies.

---

[4] The Court in Barnes relies on United States v. Maurello, 76 F.3d 1304 (3d Cir. 1996). As recognized in United States v. Aronowitz, No. 04-4044, 2005 WL 2760948, at *2 (3rd Cir. Oct. 26, 2005), Maurello (and presumably Barnes) has been overruled by application notes to the Sentencing Guidelines concerning those who fraudulent impersonate licensed professionals. In such cases, the services of those so-called "licensed" professionals cannot be a credit against loss. Id.; USSG § 2B1.1 n.2(F)(v). This licensed-professional exception is not applicable against Milkiewicz.

Moreover, Defendant disagrees with the PSR's alternative approach of including as loss only the profit from goods Mr. Milkiewicz bought from NEOS and resold to the Clerk's Office. Mr. Kelly's testimony is not as clear as the government asserts, or as clear as it needs to be to charge Mr. Milkiewicz with loss based on all NEOS purchases. Specifically, Mr. Kelly testified that prices were based on quantities and that he had additional "leeway" to charge lower prices. See excerpts from Richard Kelly 9/9/05 testimony attached as Exhibit 5, p. 15. Although he appeared to suggest on direct examination that the Clerk's Office could have purchased at the standard price based on quantity (Id., p. 8, 10), he later clarified that the Clerk's Office could not have purchased at the lower "leeway" price that he gave to Mr. Milkiewicz due to their long-standing relationship. Id., pp. 28-29.

Notably, Defendant's view of Mr. Kelly's testimony on this point is consistent with what he told the government during a pretrial interview. Specifically, in his interview with the government on August 22, 2005, shortly before the trial, Mr. Kelly made clear that "he would sell to reseller [sic] at a volume discount." See Memorandum of Interview of Richard Kelly attached as Exhibit 6. Mr. Milkiewicz was a reseller; the Clerk's Office is not. Thus, it is readily apparent that Mr. Milkiewicz's profits on items he purchased from NEOS and resold to the Clerk's Office cannot be treated as "excessive."

But even if the Court agrees with the PSR that there was evidence beyond a reasonable doubt that there was inflated profit on certain products Mr. Milkiewicz bought from NEOS and resold to the Clerk's Office, there is no basis for including all such amounts. Inclusion of the NEOS-related profits must be based on the charges of which Mr. Milkiewicz was convicted, namely, the conspiracy to "bid rig." The indictment makes clear, and the government concedes,

that the conspiracy was defined (in relevant part for this analysis) as a conspiracy to rig bids over

$2,500.  See Superseding Indictment ¶ 12 ("A major purpose and objective of the conspiracy was

to enable MILKIEWICZ to profit from selling goods and services to the Court, without

submitting to genuine competitive bidding"); ¶ 5 (referencing internal policies requiring

"SCHROEDER to obtain multiple quotes and bids for contracts above a fixed dollar threshold");

Government's Submission, p.1 ("By rigging the process of bidding for contracts over $2,500,

Schroeder and Milkiewicz managed to steer the bulk of the Court's purchases of Office Supplies

and Furniture to Milkiewicz ..."). The evidence at trial made clear that quotes were not used in

all purchases involving Mr. Milkiewicz. William Ruane testified that he did not always look for

quotes attached to vouchers Mr. Schroeder gave him. And Mr. Schroeder confirmed that there

were many times that he did not need to produce quotes to support purchases, even purchases

over $2,500.

        In this regard, and to support Defendant's contention that the government is overreaching

in this case, it is worth noting that the government's initial submission in September appeared to

suggest that the NEOS profits might be treated as a conservative alternative. See Government

Submission, p. 8 ("If the bid-rigging losses are deemed to include only Milkiewicz's mark-up of

NEOS goods ($61,778.85), the aggregate fraud loss is reduced to $232,086.42.") Only after

Probation appeared to suggest that it might be appropriate to remove an additional $30,000 from

the total loss figure – and Mr. Milkiewicz noted in his objections to the draft PSR that the

"conservative" loss figure would then by only roughly $1,000 over the critical $200,000

threshold in §2B1.1's loss table – did the government then propose yet another "conservative"

way to approach loss here that would ensure tipping Mr. Milkiewicz over that key $200,000

threshold. See December 8, 2005 letter from Paul Levenson to Cathy Battistelli, attached as

Exhibit 7 ("The United States notes, however, that if the Court opts to employ a conservative

figure for estimating the loss associated with the bid-rigging aspect of the fraud, a figure of

approximately $100,000 would be more appropriate than the $61,778.85 ...") But the

government has no evidence showing that those "new" amounts represent excessive charges. In

short, the goal should not be to use any amount available to be sure the loss exceeds $200,000;

the goal should be to arrive at the accurate and fair loss figure.

Thus, even if the Court treats as loss profits Mr. Milkiewicz made from sales to the

Clerk's Office of products he purchased from NEOS, the loss amount is not the full $62,876.61

in profit from NEOS purchases. That is because, first, $5,992.05 must be deducted for the NEOS

purchases that did not reach the $2,500 threshold and thus did not involve bids or quotes.

Moreover, for many of the purchases from NEOS over $2,500, there is insufficient evidence of

any bidding at all. Specifically, as detailed in the chart attached as Exhibit 8, the government has

no evidence of three quotes having been submitted to support certain of those NEOS sales. The

transactions for which there is no evidence of three or more quotes comprise another $20,864.76[5]

of the profit the PSR advocates treating as loss.[6]

When these amounts are deducted, the total amount of profit remaining for NEOS

transactions is $36,019.80.

---

[5] This figure includes all transactions that have fewer than three quotes. If the Court chose to deduct only those where there is no evidence of any bids, the Court should deduct $10,545.36.

[6] If the Court looks to Mr. Milkiewicz's profits for all transactions, the same problem exists and Defendant would request an evidentiary hearing at which the government would need to prove that bid-rigging was involved in all of the transactions for which it attempts to treat profit as loss.

(2)    The portion of the loss for "nondelivered" goods must be limited to the false claims counts

The second component of the loss figure in the PSR is the loss relating to goods Mr. Milkiewicz did not delivered. By convicting Mr. Milkiewicz of the false claims charges, the government proved beyond a reasonable doubt that Mr. Milkiewicz billed for, but did not deliver, the items specified in the false claims counts, which were Counts 2 through 9. The total amount the government paid for those goods that were not delivered was $39,623.[7] This amount is clearly loss that must be attributed to Mr. Milkiewicz. And, for the reasons discussed below, it is the only loss that can be attributed to him for goods not delivered.

The government tries to exaggerate the loss figure, claiming that the total loss for undelivered goods is $170,307.57. That includes $146,191.32 the government claims represents goods not delivered to the Clerk's Office, plus an additional $24,116.25 for chairs the government claims were not delivered to Probation – a department whose procurement was not even handled by Schroeder.

The PSR notes a lower alternative, $139,912.07, which is still excessive. The PSR's figure adopts for the most part the government's summary chart, but suggests that it might be appropriate to deduct (1) $24,116.25 for the 59 chairs purchased by Probation, not the Clerk's Office, and (2) $6,279.25, which was an amount the government tried to attribute to Mr. Milkiewicz for undelivered paper even though Mr. Milkiewicz's paper vendor (Resale Paper)

---

[7]  This figure is the money paid only for non-delivered goods. Some of the orders set forth in the false claims counts were delivered in part (e.g. 10 of 20 were delivered); the $39,623 figure in the text above excludes the profit for goods that were delivered in an order where some goods were delivered and some were not.

-18-

had no records for the period in question.  Although the two deductions are appropriate, the fundamental analysis is fatally flawed.

First, the discrepancy in treatment between Mr. Milkiewicz and Mr. Schroeder regarding this loss suggests that the government is trying to punish Mr. Milkiewicz for exercising his right to trial.  Specifically, the government attributes, and the PSR for the most part accepts, a lower loss figure to Mr. Schroeder for the same conspiracy.  In its submission for Mr. Schroeder's sentencing, the government took the position that there was only $107,545 in loss for goods that were billed for, but not delivered.  See Memorandum dated January 10, 2005 from Paul G. Levenson to Cathy Battistelli, attached as Exhibit 9 at p. 4.  This figure proposed for Mr. Schroeder contrasts sharply and inexplicably with the $170,307.57 the government now attempts to attribute to Mr. Milkiewicz for the very same alleged conspiracy involving the very same transactions.

In its submission to Probation for Mr. Schroeder, the government stated that, "[a]s reflected in the column labeled "Product Not provided to Court" in Exhibit B, there are numerous additional instances (totaling $70,598.68) in which Milkiewicz's companies were paid for items while Mr. Milkiewicz's business records contain no entry showing that such items were ever purchased.  It is likely that some, or even all, such items were fraudulently billed, but these amounts have not been included in the government's loss figures."  Government's memorandum, p.4 n.1.  According to the PSR, and in response to Defendant's complaint about this disparity, the government apparently claimed that the investigation following Mr. Schroeder's plea allowed the government to substantiate further loss relating to undelivered products.  That draft report described the government's explanation for the disparity as follows: "This figure is different

-19-

from the $107,545 used in codefendant's Schroeder's case as the government continued its

investigation following Schroeder's change of plea hearing and was able to substantiate further

amounts associated with this criminal conduct." See draft PSR, ¶ 15, n. 4.

The government's explanation is disingenuous. The amounts in question were included

on a summary chart presented to the grand jury; that amount was included under the column

"product not provided to court." See Grand Jury Exhibit 2, attached here as Exhibit 10.  Thus,

the government was well-aware of these transactions before the trial. More importantly, given

that the government arrived at that figure through a negative inference – if the government could

not find evidence of Mr. Milkiewicz having purchased the item, the government deemed it

undelivered - it defies logic to understand how the government could "substantiate further

amounts" after Schroeder plead guilty. Put another way, the government's continued

investigation could only – by definition – have lowered this loss figure by uncovering

exculpatory evidence proving that Mr. Milkiewicz had purchased certain goods previously

treated as "roduct not provided to court." The investigation, presumably, could not uncover more

evidence of "non-purchases."

Relatedly, this disputed amount that the government seeks to attribute to Mr. Milkiewicz

but not to Mr. Schroeder was never part of the indictment to begin with, reaffirming that is not

relevant conduct, but an add-on designed to inflate Mr. Milkiewicz's sentence. Consistent with

what the government recommended for Mr. Schroeder, the indictment referenced only $107,000

in charges for goods that were allegedly not delivered. See Superseding Indictment, ¶23. The

loss the government now attempts to use to inflate Mr. Milkiewicz's sentence were never at issue

and cannot be raised now. In short, there is no conceivable basis for distinguishing between the two co-defendants on this point.

Second, the Probation chairs are plainly add-ons designed to push Mr. Milkiewicz into the larger loss bracket. As the Court will recall, there was no evidence at trial or otherwise supporting the government's contention these purchases by Probation – not Mr. Schroeder's department – should be included in the loss figure. Moreover, the government did not apparently believe it worth bringing to Probation's or the Court's attention that the procurement officer for Probation signed off that she had received the 59 chairs the government describes. See Exhibit 11. Moreover, there is nothing in any of the memoranda summarizing interviews with Mr. Schroeder that supports even believing that these 59 chairs Probation purchased through Ms. LeBlanc were part of a scheme involving Mr. Schroeder and Mr. Milkiewicz.

Third, there was ample evidence at trial and otherwise demonstrating numerous problems with the approach the government used to determine whether certain items were not delivered. Mr. Schroeder himself made clear that "the vast majority of the invoices were legitimate." See Memorandum of Interview with Timothy Schroeder dated October 28, 2002, attached as Exhibit 12. Given that concession, it would be wrong to treat as undelivered every product on the government's chart. And, there are numerous examples of the flaws in the government's approach of proving the negative through a lack of records. For example, Michael Williams from Resale Paper testified that he is confident in the integrity of his records after November 1998, but not in earlier records because many were lost or destroyed. Notably, several of the sales to the Clerk's Office that are treated as "undelivered" on the government's Exhibit 1 are for paper sales during this very time frame for which all of Resale Paper's records – Mr.

-21-

Milkiewicz's supplier – were nonexistent. The government, despite its knowledge that these

records were missing, did not bother to note this problem to Probation in its original submission.

See Government's Submission, Exhibit 3. While the PSR recommends deducting this amount

because of Resale Paper's incomplete records, the larger problem is that the entire

"nondelivered" amount is based on similar deficiencies in records and in proof.

By way of another example, an IRS interview memorandum indicates that, on August 27,

2004, Howard Whitman stated that American Expandable Products and Holex Office Systems

had dissolved and that the business records are no longer available. See Exhibit 13.   And John

Delano of "Making Your Mark" who testified at trial could not rule out that Mr. Milkiewicz may

have purchased the signs the government concludes were not delivered.

Further highlighting the flaws in the government's methodology is the fact that, despite his poor

record keeping, Mr. Milkiewicz was able to prove at trial that he did, in fact, deliver certain

products that – as of the trial – were still being categorized on the government's chart as

"undelivered."   Specifically, at trial, Mr. Milkiewicz submitted evidence refuting the

government's conclusion that he did not pay for $2,700 in library cart rentals for a project

involving the move to the new courthouse, and that he did not deliver imprint mugs for $717.[8]

During the trial, the government correctly removed these items from the list of items it

maintained had not been delivered. And, given Mr. Milkiewicz's proof at trial that this project

---

[8] The government failed to identify Jerry Goldberg Enterprises, Inc. as a vendor of Mr. Milkiewicz's and his supplier of the imprint mugs. As a result, it presumed that Mr. Milkiewicz never purchased this product for resale. Mr. Milkiewicz was able to locate records showing otherwise. In addition, the government failed to credit Mr. Milkiewicz with paying $2,700 to Rent-A-Crate for rental of library carts. Records subpoenaed from Mr. Milkiewicz's bank were inaccurate and did not include this cancelled check. Fortunately, Mr. Milkiewicz had a copy of this cancelled check, as the government had counted this $2,700 as "quantity difference" or non-delivery.

involving the rental carts happened, it is also logical to credit Mr. Milkiewicz with the cash he paid to laborers hired for that move. See Exhibit 14, which is a check for $5,000 paid within days of the $5,500 in labor costs (invoice date 9/28/98) that the government's chart claims were not really incurred. While these items are not large dollar amounts, they are significant in illustrating why the government cannot simply treat as loss items it claims were not delivered merely because the government does not know where Mr. Milkiewicz purchased those items and Mr. Milkiewicz cannot refute the assertions due to poor record keeping. Moreover, it is not Mr. Milkiewicz's burden to prove what he delivered – it is the government's burden to prove what he did not deliver.

Fourth, and relatedly, an IRS agent testified unequivocally at trial that it was impossible to track Mr. Milkiewicz's cash purchases. Thus, the government could not, by its own admission, track a purchase if Mr. Milkiewicz used cash, or if he used cash to buy a money order. There was, over the time of the conspiracy, a total of $181,276.68 in cash withdrawals (payable to cash or to Mr. Milkiewicz) from the J. Cameron account. See Exhibit 15 attached. To be conservative, Mr. Milkiewicz is not including the additional, untraceable cash amounts from the C.J. Sales account. The government will try to assert that its affidavits from some of Mr. Milkiewicz's vendors rule out that they received cash. But, despite the boilerplate language in each of the affidavits the government drafted for those vendors and introduced at trial, several of the live witnesses testified to the contrary. For example, Greg Steel of Fay Paper testified – despite his affidavit – that he did accept cash. At least two other vendors also accepted cash, namely, Howard Whitman (American Expandable/Holex) and Frank Lane (Lane Printing); one can glean that many if not all of the non-testifying vendors would have testified similarly.

-23-

Moreover, the testimony made clear that all vendors, not surprisingly, would accept bank checks or money orders; accordingly, it would be virtually impossible for the government to have given Mr. Milkiewicz credit for the cash he put toward money orders for product.[9] This gaping hole in the government's loss theory requires that nothing but the specific transactions proven through convictions for false claims be included in the loss amount for the category of undelivered goods.

The onus is not on Mr. Milkiewicz to prove delivery, or the absence of fraud, in order to reduce the government's loss figures. The burden of proving loss is on the government. Regardless of the standard of proof employed, the government cannot justify its loss numbers unless the burden is shifted to Mr. Milkiewicz. Because Mr. Milkiewicz is unable to prove that he did not defraud the Clerk's Office on a certain transaction (i.e. by proving that he purchased goods from a supplier), the government presumes loss. To accept the government's Exhibit 1 as the loss would improperly burden Mr. Milkiewicz with proving, or disproving, the loss. Cf. Mullaney v. Wilbur, 421 U.S. 684, 702 & n.31 (1975) (difficulty for prosecution in proving a negative, i.e., lack of heat of passion, does not justify shifting burden of persuasion to defendant). In limited circumstances, devices are permissible that shift the burden or create a presumption, such as the presumption of sanity. The Due Process Clause, however, requires "more exacting standards" before the defendant can be so burdened here. Id.

Quite significantly, the government had for more and better proof of "nondeliveries" for the sales that were the subject of the false claims counts than it did for any of the "other" alleged non-deliveries it now seeks to treat as loss. The transactions comprising the false claims for

---

[9] For example, Agent Wlodyka agreed during his testimony that no efforts had been made to track a $2,606 check written on Mr. Milkiewicz's personal account for even though the memorandum portion of the check made clear that a money order had been purchased using this check.

which Mr. Milkiewicz was convicted all came from a single vendor, NEOS, whose records were far more complete than any of the other vendors whose records were introduced at trial. It is clear why the government used these records to support the false claims counts and nondeliveries – because they were the only records that were both electronically stored and even close to complete. Perhaps even more significantly, there was testimony at trial from Richard Kelly from NEOS that bolstered the government's allegation that Mr. Milkiewicz had shorted the Clerk's Office on those particular NEOS purchases. Thus, for those purchases, the government arguably did not rely merely on the negative inference to be drawn from the lack of proof that Mr. Milkiewicz bought product from someone else. Rather, the government had Mr. Kelly's testimony to put meat on the bone. The same is not the case for the other purchases on the government's chart; for those, the government relies solely on its inability to locate documentation supporting Mr. Milkiewicz's purchases. To allow the government to bootstrap its only provable false claims to other transactions it could not prove were not delivered is wrong, flawed, and should be rejected. This is particularly so in light of the incompleteness and/or unavailability of the vendors' records for many of these transactions.

Furthermore, there is a good explanation for why only NEOS purchases comprised the bulk of the nondelivery conspiracy. There was testimony from Katherine Bessett (NEOS) that paper was delivered off-site, away from the Courthouse. Thus, it was possible to hide a shorted delivery. Other products, according to Frances dello Russo, were orded on an as-needed basis for particular projects; this project-based ordering would obviously make it much more difficult to fail to deliver a particular item other than paper and, perhaps, toner. Indeed, on this point,

common sense should suggest that Judge Tauro would have noticed if he had not received the chair noted on the government's spreadsheet.

Thus, it is Defendant's position that the only loss attributable to undelivered goods is $39,623 and not the inflated figure of $170,307.57 ($146,191.32 for undelivered Clerk's Office purchases plus $24,116.25 for the 59 Probation chairs) that the government proposes. Certainly, under no view of the law or facts can that amount be higher than the $107,545 figure that the government used for Mr. Schroeder for this aspect of the loss.

### (3)  The tax loss suffers from the same infirmities as the "nondelivered" goods

The tax loss, alleged to be $104,694.93, suffers from the same infirmities as the nondeliverables because the cost of goods sold figure is based on the government's excessive view of what was not delivered. Should the Court agree with Mr. Milkiewicz that it is excessive to treat all of those items as undelivered, the tax loss would be reduced to the "more than $30,000" (below the $80,000 currently cited in the PSR) category on §2T4.1.

This change, in turn, would affect the grouping. Specifically, because there would be a greater difference between the base level offense for the tax count and that for the fraud counts, Mr. Milkiewicz would receive only one additional point under §3D1.4, not the two points set forth in the PSR.[10]

---

[10]  This analysis is based on a loss figure for profit consistent with the government's proposal. If the Court agrees with Mr. Milkiewicz on the inappropriateness of treating profit as loss, Defendant's grouping analysis above would not apply.

(4)    Many of the Proposed Enhancements Do Not Apply, or Should
        Npt Be Applied

In addition to inflating the loss figures, the government artificially inflates the sentence in

this case by recommending patently inapplicable enhancements for Mr. Milkiewicz. Quite

strikingly, many of the enhancements proposed for Mr. Milkiewicz were not recommended for

Mr. Schroeder even though they arise out of precisely the same transactions and even though Mr.

Schroeder's conduct and position render him more culpable than Mr. Milkiewicz. Each of these

enhancements the government proposes is addressed below.

a.    The "sophisticated means" enhancement

This enhancement, as the government well knows, is inappropriate here, as evidenced by

the government's failure to make the same request for an enhancement for Mr. Schroeder.

Sophisticated means were not used here and Mr. Milkiewicz should be treated similarly to what

the government recommended for Mr. Schroeder.

b.    The Leader/Organizer enhancement is inapplicable

The government takes the position that Mr. Milkiewicz played an aggravating role in the

offense, subjecting him to a two-level increase because he was a "leader/organizer" of criminal

activity. Government's memorandum, p. 8 (Sept. 30, 2005). As the PSR correctly states, this

enhancement is inapplicable as a matter of law. And it is further evidence of the government's

attempt to punish Mr. Milkiewicz for exercising his right to a jury trial.

The government's attempt to deem Mr. Milkiewicz a "leader/organizer" is belied by the

fact that the government has made no such request for an enhancement for Mr. Schroeder – the

insider in the position of trust who was the only person who could have orchestrated this

conspiracy and recruited participants. Mr. Schroeder was the procurement official for the Clerk's

Office with a sworn charge to perform his duties fairly. Moreover, Mr. Schroeder held the key

position in the conspiracy as alleged by the government in that he was the one who, among other

things, (1) provided quotes to his superiors, (2) submitted false invoices for payment, (3)

confirmed delivery of goods that had not been delivered, (4) awarded contracts, and, (5) violated

his sworn duties to the Clerk's Office by conspiring with Mr. Milkiewicz. Certainly, if these

qualities do not make Mr. Schroeder a "leader/organizer" – and the government has not requested

this enhancement for Mr. Schroeder – the far lesser involvement of Mr. Milkiewicz certainly

cannot rise to that level.

Moreover, as a matter of law, Mr. Milkiewicz was not a leader or organizer of Mr. Kelly

and Mr. Franzone, as evidence by the nature and purpose of §3B1.1. Factors for determining

whether one is a leader or organizer are:

- "the exercise of decision making authority;"

- "the nature of participation in the commission of the offense;"

- "the recruitment of accomplices;"

- "the claimed right to a larger share of the fruits of the crime;"

- "the degree of participation in planning or organizing the offense;"

- "the nature and scope of the illegal activity;" and

- "the degree of control and authority exercised over others."

USSG §3B1.1, Note 4 (2002).

First, Mr. Kelly and Mr. Franzone are not "participants" who could be viewed as

criminally responsible for the commission of the offenses. See USSG §3B1.1, Note 1 (2002).

Mr. Franzone's involvement, if any, has not been established and is unknown. He did not testify

at trial and Mr. Schroeder likewise did not specifically testify as to Mr. Franzone's involvement,

if any. Even if Mr. Franzone did submit quotes, like Mr. Kelly, such submissions, without more,

do not make them criminally responsible for the offenses. Mr. Kelly's testimony shows that he

had no criminal intent in submitting the quotes. He testified that he had no knowledge that Mr.

Milkiewicz submitted false claims or failed to deliver some products. In that way, Mr. Kelly is

no different that the Clerk's Office personnel Mr. Schroeder duped into signing delivery receipts.

Thus, even if Mr. Milkiewicz was a leader, "supervis[ing] mere 'dupes,' unaware of criminal

activity" does not justify an enhancement under §3B1.1. United States v. Bey, 188 F.3d 1, 10

(1st Cir. 1999); see also United States v. Lewis, 68 F.3d 987, 989-90 (6th Cir. 1995) (no

enhancement for recruiting unwitting persons to engage in fraud); United States v. Melendez, 41

F.3d 797, 800 (2d Cir. 1994) (no enhancement for supervising innocent parties).

In support of its argument, the government cites Mr. Kelly's testimony that Mr. Milkiewicz

asked him to provide price quotes and baldly claims – without evidence – that Mr. Milkiewicz

asked Mr. Franzone (who did not testify and about whom there was not testimony at trial) to

provide quotes on certain occasions. Any leading or organizing here is de minimus, and such a

broad view of §3B1.1 could make anyone a leader/organizer.

> c.    Mr. Milkiewicz should not be given an enhancement for
> obstruction of justice

The government attempted to inflate Mr. Milkiewicz's sentence by claiming that Mr.

Milkiewicz obstructed justice on three separate occasions and by recommending an obstruction

enhancement under USSG §3C1.1. Probation has concluded that Mr. Milkiewicz should be

given two points for obstruction related to his conversation with Mr. Pike, a witness at trial. As discussed below, this enhancement is unwarranted, especially in light of Mr. Pike's refusal to heed the Court's warning at trial that he not characterize or dramatize his testimony and in light of his utter lack of credibility.

The obstruction enhancement recommended by Probation is based on a single meeting Mr. Milkiewicz had with Mr. Pike. As an initial matter, it is significant to note that the government was aware of this meeting approximately two years before the indictment; presumably, if the government believed this meeting constituted obstruction of justice, it would have charged Mr. Milkiewicz with this crime in its expansive indictment

The government did not charge Mr. Milkiewicz with obstruction because there was no obstruction. Mr. Milkiewicz was visited by agents at his home on July 8, 2002. As noted in the government's interview memorandum, Mr. Milkiewicz was asked to locate business records that would help prove that he had purchased certain goods that he sold to the Clerk's Office. Mr. Milkiewicz called Mr. Pike the day after the government interview to set up a meeting for the next day;[11] Mr. Pike was one such vendor with whom Mr. Milkiewicz did business early on after starting J. Cameron. A contemporaneous letter from Mr. Milkiewicz's then-attorney to the government dated July 16, 2002, confirms that Mr. Milkiewicz was, in fact, working with his vendors to track down all available business records. In that letter (government's Exhibit 26 at trial), Mr. McMenimen informed the government that, "[m]y client advises me that he is putting

---

[11]  The government's memorandum wrongly states that Mr. Milkiewicz met with Pike the day after his government interview; Mr. Pike's interview memorandum says otherwise.

together such additional records as he can either locate <u>or obtain from vendors</u>..." <u>See</u> Letter attached as Exhibit 16 (emphasis added).

Mr. Pike's testimony that Mr. Milkiewicz asked him to back-date price quotes simply does not make sense. As of that July 10, 2002 meeting between Mr. Pike and Mr. Milkiewicz, Mr. Schroeder was no longer employed by the Clerk's Office due to the discovery of his scheme to embezzle using MS & Associates. Thus, Mr. Milkiewicz could not have had any use for back-dated quotes – he would have needed Schroeder to plant any such quotes in Mr. Schroeder's files. Likewise, back-dated quotes would not have helped Mr. Milkiewicz as he did not need quotes, but rather, needed documentation to support that he had made certain purchases from A&G Sales, the company at which Mr. Pike worked. And, the crux of the government's case at trial was that Mr. Milkiewicz routinely manufactured fake quotes. Thus, it is perplexing why he would ever need Mr. Pike or anyone else to do this for him at that point.

Mr. Pike's credibility must be seriously questioned. When first approached by the FBI, he denied having done any business with Mr. Milkiewicz since Mr. Milkiewicz left Business Products Unlimited, where they had both worked previously. <u>See</u> September 6, 2002, Interview Memorandum attached as Exhibit 17. Only when shown quotes from A&G did he concede this was not correct. It is hard to believe that Mr. Pike would not recall having done business with his former colleague; his testimony at trial supports the conclusion that this was not a failure in memory but was mere deliberate. In particular, having denied in 2002 having any memory of doing business with Mr. Milkiewicz, at trial – three years later – Mr. Pike testified that he suddenly recalled that it was a "rainy day in October" when Mr. Milkiewicz contacted him to

quote on a job. His testimony is simply not credible, including his illogical characterization of the meeting with Mr. Milkiewicz.

At best, viewing Mr. Pike's testimony charitably, one would have to assume he jumped to conclusions about Mr. Milkiewicz's request. In his second interview with the government, which interview was shortly before trial, Mr. Pike dramatically described the meeting with Mr. Milkiewicz as being like a "scene from the movie GoodFellas." When the government attempted to draw out of Mr. Pike facts supporting the "GoodFellas" characterization, Mr. Pike made clear a number of things that call into question his after-the-fact characterization of the meeting as somehow nefarious. Specifically, he made clear that he had chosen the Castle Island site for the meeting B not Mr. Milkiewicz. Moreover, he also made clear that the temperature was near 100 degrees, shedding light on why Mr. Milkiewicz may have been sweating profusely. Similarly, although Mr. Pike testified at trial that Mr. Milkiewicz told him "this conversation never happened," the memorandum summarizing his interview with the agents far closer to the time of the meeting (within two months) says only that "Milkiewicz asked Pike not to mention this contact to anyone." See 302 of William Pike dated September 6, 2002, attached as Exhibit 17. Certainly, one can imagine many reasons why Mr. Milkiewicz, a business person, would not want Mr. Pike to tell the world that he was being investigated by the IRS.

Also undermining the notion that Mr. Milkiewicz tried to obstruct justice, Mr. Kelly from NEOS testified unequivocally that Mr. Milkiewicz made no such requests of him. See excerpts from Richard Kelly 9/12/05 testimony, Exhibit 5, pp. 53-55. It does not make sense that Mr. Milkiewicz would be willing to seek improper assistance from Mr. Pike, but would not recruit his friend Rich Kelly to do the same thing.

That Mr. Pike misconstrued the meeting makes far more sense than the notion that Mr. Milkiewicz attempted to obstruct justice. In fact, Mr. Pike only put his darker "spin" on that meeting after he was approached by the government – he never reached out to the government to suggest that Mr. Milkiewicz had done anything improper. In short, Mr. Pike's testimony does not make sense and cannot support the serious two-point enhancement for obstruction of justice that the government seeks and the PSR recommends.

### d. The 2-point enhancement under §2T1.1 should not be applied

The PSR recommends this enhancement based on Mr. Milkiewicz failing to report income exceeding $10,000 from criminal activity. This addition "double counts" in that the grouping rules already address punishment for multiple offenses. The government did not recommend this two-point enhancement and it should not apply here.

### (5) Mr. Milkiewicz is Entitled to Downward Departures/Adjustments

There are two separate bases for adjusting Mr. Milkiewicz's sentence downward. First, as the PSR suggests, the criminal history category grossly overrepresents the seriousness of his past criminal conduct. The first conviction that forms the basis for this criminal history category was a continuance without a finding on an alleged operating while under the influence, and related charges; that continuance appears to have converted to a "guilty" as a result of the second charge that is creating this higher criminal history category. That second offense/s was also a driving-related charge; Mr. Milkiewicz was found guilty of operating after a suspended license, operating to endanger, and leaving the scene after property damage. In short, an enhancement for these

-33-

events – which took place within an isolated four-month period more than a decade ago –
overrepresents the seriousness of those crimes.

Furthermore, in evaluating this request, the Court may consider Mr. Milkiewicz's age in
considering the low risk of recidivism. Under 18 U.S.C. § 3661, "no limitation shall be placed
on the information concerning the background, character, and conduct of [the defendant] which a
court of the United States may receive and consider for the purpose of imposing an appropriate
sentence," overriding the now-advisory policy statements in Part H of the sentencing guidelines,
which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's
age, educational and vocational skills, mental and emotional conditions, drug or alcohol
dependence, and lack of guidance as a youth. See U.S.S.G. § 5H1. See also United States v.
Nellum, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (noting that
fifty-seven-year-old had a very low likelihood of recidivism since recidivism reduces with age
and citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal
History Computation of the Federal Sentencing Guidelines, May 2004); United States v. Naylor,
359 F. Supp.2d 521, 524-25 (W.D. Va. 2005) (Jones, J.) (imposing sentence below career
offender guideline range because of defendant's youth when he committed his predicate
offenses).

Second, Mr. Milkiewicz requests a downward departure based on his substantial
assistance in another case that, based on the government's representations, will result in a guilty
conviction. See PSR ¶ 47. Such a departure is well within the Court's discretion under
§ 3553(a). Mr. Milkiewicz volunteered this information as part of his then-attempt to cooperate
both in his own investigation and in an effort to bring another crime to the government's

-34-

attention. At that time, Mr. Milkiewicz believed he was going to plead to criminal charges and

assist the government in investigating bribes by IRS agents, or people posing as IRS agents. Mr.

Milkiewicz's volunteering of this information, and his substantial assistance in investigating that

crime, warrant favorable consideration at sentencing, not a sentencing enhancement.

Specifically, from March through May 2002, Mr. Milkiewicz, at great risk to himself, wore a

wire and recorded telephone calls and meetings with the subjects of that investigation.

Moreover, the PSR notes, presumably based on information from the government, that the

government is about to, or has, issued an indictment against individuals against whom Mr.

Milkiewicz cooperated. See PSR ¶ 47.

      It is worth noting that the government tried to use this protected information against Mr.

Milkiewicz to seek an enhancement for obstruction of justice. As Probation agreed in the PSR,

this reliance on Mr. Milkiewicz's proffer is contrary to Mr. Milkiewicz's proffer agreement with

the government by which the government agreed that no statements Mr. Milkiewicz made would

be used against him except for "a prosecution of Steven Milkiewicz based on false statements

made or false information provided by Steven Milkiewicz during this proffer or afterward." It is

also contrary to §1B1.8 which prohibits consideration of statements made during a proffer. In

any event, the government's attempt to add points wherever possible, even by including protected

information in its submission, should be rejected and Mr. Milkiewicz should be given a favorable

treatment due to his substantial assistance.

D.  The Need To Avoid Unwarranted Disparities

As discussed above, if the government's disparate recommendations for Mr. Schroeder and Mr. Milkiewicz are followed, there will be a gross and unfair disparity in sentencing between the two men, contrary to the satutory framework.  18 U.S.C. §3553(a)(6). Mr. Schroeder is the more culpable defendant. Among other things:

- He stole $180,000 in his own separate scheme using M.S. & Associates;

- He was convicted of bribery, which Mr. Milkiewicz was not;

- He was the insider at the Clerk's Office with the sworn duty to handle procurement.

Despite the more culpable conduct, the government did not recommend the following enhancements and/or sentencing facts for Mr. Schroeder, even though it did recommend them for Mr. Milkiewicz under identical, or similar, facts: sophisticated means; obstruction of justice[12]; leader/organizer.  Similarly, the government took contradictory loss positions vis a vis Mr. Schroeder and Mr. Milkiewicz, as discussed above. In short, the government was correct in not recommending these enhancements, or taking these positions on the loss figures, for Mr. Schroeder and Mr. Milkiewicz should likewise not receive these additional points.[13] Certainly, under no measure of fairness should Mr. Milkiewicz receive a higher sentence than Mr. Schroeder.

---

[12]  The government sought to give Mr. Milkiewicz points for obstruction based on statements he made when interviewed in his home; it made no such recommendation for Mr. Schroeder, who lied outright when approached by the agents about his M.S. & Associates scheme. Probation concluded that the interview did not warrant an obstruction enhancement.

[13]  The government put Mr. Schroeder at a total offense level 26 (before deducting points for acceptance of responsibility) and put Mr. Milkiewicz at 25.

E.  The need to provide restitution to any victims of the offense

The statutory factors include the need to provide restitution. 18 U.S.C. §3553(a)(7). Mr. Milkiewicz will not be able to earn any income while incarcerated. Accordingly, a shorter sentence would permit him to begin repaying any restitution ordered in this case. In any event, the restitution amount, under Booker, cannot exceed the loss figure that is determined beyond a reasonable doubt.

## Recommendation of Fort Devens

Defendant requests that the Court recommend incarceration at Fort Devens so that Mr. Milkiewicz's wife and children can visit him as regularly as possible.

STEVEN A. MILKIEWICZ,
By his attorneys,


_____/s/  Michelle R. Peirce_____
Bruce A. Singal, BBO#464420
Michelle R. Peirce, BBO #557316
Donoghue, Barrett & Singal, P.C.
One Beacon Street, Suite 1320
Boston, MA  02108
(617) 720-5090

Dated:  December 21, 2005

## CERTIFICATE OF SERVICE

I, Michelle R. Peirce, hereby certify that I have caused a copy of the foregoing document to be served upon by hand delivery, to be served upon Paul Levenson, Assistant U.S. Attorney, United States Attorney's Office, One Courthouse Way, Suite 9200, Boston, MA  02210, this 21st day of December, 2005.

_____/s/  Michelle R. Peirce_____
Michelle R. Peirce

Consulate General of the United States of America
Ho Chi Minh City

December 15, 2005

S/A John M. Milkiewicz
U.S. Consulate General Ho Chi Minh City
4 Le Duan Street, District One
Ho Chi Minh City, Vietnam

The Honorable Paul J. Barbadoro
Warren B. Rudman U.S. Courthouse
55 Pleasant Street
Concord, N.H. 03301

Dear Judge Barbadoro:

I am a brother of Steve and I am writing to you today on his behalf. When we were growing up in Holyoke, Mass., it was under difficult circumstances. We had a bad family situation and there was no one around to stick up for us or give us proper guidance. During that period of time, Steve stood out in our family and became the anchor for it. Steve was always there for us when we needed him. When I was growing up, my brother set an example of determination and achievement that I always strived to either meet or exceed. Steve was a local sports hero in Holyoke and he always took time for me to show me how to play sports, especially football. Under his tutelage, I learned to work hard, never give up, strive to do my best and always succeed. Due to his tireless and determined efforts, I learned the game well and during my senior year was elected captain of the high school football team. I credit my brother with making that happen for me.

His drive and determination would again play a part in helping me succeed. Later on when I was attending college, I was having a rough semester and thought about dropping out. During a visit to him, I told my brother of my what I thought was my final decision to leave school. Steve would have no part of it. He sat me down and convinced me that although I was experiencing a rough patch now, if I stuck with it, the rewards would be worth the struggle. After that talk I regained the confidence I needed to finish the semester and go on to graduate. I now have what I consider a great career as a Special Agent with the Diplomatic Security Service along with a happy and healthy family and I feel I owe that in no small part to my brother.

I say this because when I visit with his family now; I see the same strength, determination and guidance that he is bestowing to his family that he instilled in me long ago. He has been a strong influence in my life and clearly this influence being passed on to his son Jay and daughter Cameron. I ask you to please consider these positive attributes when reviewing my brother's case.

Sincerely,

John Milkiewicz
Special Agent;
U.S. Department of State
Diplomatic Security Service

1 of 1

*Martin J. Dunn*

ATTORNEY AT LAW

302 High Street, 4th Floor
Peoples Bank Building
Holyoke, MA 01040
TEL: (413) 532-5639
FAX: (413) 382-7183

December 14, 2005

The Honorable Paul J. Barbadoro
Warren B. Rudman US Courthouse
55 Pleasant Street
Concord, NH 03301-3941

Re:  Steven Milkiewicz

Dear Judge Barbadoro:

Please accept this letter in support of Steven Milkiewicz.  I have been a friend of Steven's for the past forty (40) years having grown up with Steven as a child in Holyoke, Massachusetts and attending Holyoke High School with him.  I am currently a practicing attorney in Holyoke and have previously served as an Alderman, Mayor and State Senator representing the City of Holyoke.  I have remained friends with Steven and have frequently come across him in Holyoke over the years.  Steven's mother and large extended family continue to reside in Holyoke and Steven regularly visits his family and friends.  Based on this forty (40) year relationship I respectfully set forth the following observations.

Growing up in Holyoke Steven was a well known and respected young man excelling in Holyoke's little league sports programs.  Steven went on to become a star football player at Holyoke High School, Class of 1974, and without question was a leader and one of the most popular and respected members of that class.  Steven was well liked not because he was a football star but because he was a good person.  Steven went from Holyoke High to the University of Massachusetts in Amherst where again he excelled in football and was a well known and respected U-Mass student.  I witnessed Steven's life during all of these years in Holyoke and Amherst and can assure you that Steven was not handed opportunities but worked tirelessly to create his own.  Steven was a young man of modest means from a tough neighborhood who early on in life understood the value of hard work and education.

The Honorable Paul J. Barbadoro
Re:  Steven Milkiewicz
December 14, 2005
Page 2

Over the years, although moving to the Boston area, Steven has remained dedicated and loyal to his Holyoke friends and family. He visits his family and friends in Holyoke on a regular basis, always checking on their well-being and is always there to help anyone in need.  Steven is known in Holyoke as a caring person and loyal friend to many.  I am certain that from family to teachers to coaches to friends, they would all echo my comments if given the opportunity.  Steven has spent a lifetime connected to the Holyoke Community, never asking for help but always there to give it.  I could never overstate how much he is cared for in this city.

In closing, as previously stated, I have known Steven for over forty (40) years.  I have been his classmate, teammate and friend.  In these forty (40) years, I have never observed even the slightest exhibition of greed or selfishness on Steven's part.  Whatever happened, I cannot explain, but can only represent that Steven Milkiewicz has done an awful lot of good in this world for a great many people.  He is committed to his wife and children beyond explanation.  I have been fortunate and grateful throughout my life to have Steven as a friend.

Very truly yours,

Martin J. Dunn

MJD/kh

December 9, 2005                                    119 Summer Street
                                                   Scituate, MA 02066

The Honorable Paul J. Barbadoro
New Hampshire Federal District Court
Warren B. Rudman U.S. Courthouse
55 Pleasant Street
Concord, NH 03301-3941

Dear Judge Barbadoro:

It is my hope that this letter will allow you to see some of the positive achievements and contributions of my husband, Steven Milkiewicz. Having been married for 24 years this Fall, I know this man's foundation to be his family and his home, followed closely by his friendships which have endured from days of growing up under difficult circumstances in Holyoke, Massachusetts.

Let me start with Steve's background. He was born and raised in a mill city on the Connecticut River in a family of five children. Money was tight and neither of Steve's parents were educated beyond high school. Somehow Steve was able to develop his own strong values of studying and doing well in school, and also took on great responsibility for watching out for his younger siblings. This meant that on many mornings on route to school, Steve would have to defend his younger brother John as older, toughs tried to steal his lunch money. Steve has always said that his salvation was football, and he is grateful to the many coaches who took him under their wings to give him the opportunity to play. When he broke his arm his senior year in high school during a game, it dashed his hopes of receiving a college scholarship. After taking a short time off after graduation to earn money, he applied and was accepted to the University of Massachusetts at Amherst. He cobbled together his earnings, and researched and was awarded enough private scholarship money and work study opportunities to be able to attend. He tried out for the university football team, a Division 1AA program, and through his determination and hard work was given a spot on the team, first on JV's, and then progressing to varsity. A highlight of his life was playing in the national championships in Wichita Falls, Texas. His 1983 team was recently honored on the twenty-fifth anniversary of their achievements at a UMass homecoming game, with of course our children, and Steve's family from western Massachusetts in attendance.

It was during our college days that I met Steve and have been with him ever since. I have always contributed to our household financially, and couldn't have had the successes I had without the steadfast support of Steve as a husband, and then as a father to our two children, Jay, now 17, and daughter Cammie, 14 years. When our children were young, I worked four days a week in Boston, requiring a long commute. It fell to Steve on my work days to get our children ready for day care, drop them off (a 10 mile long round trip), and most days pick them up in the afternoon and begin the evening meal before I arrived home, often after 6:30 at night. In between, he handled his work

responsibilities. When my son was only one year old, I was injured in a serious car accident on the way to work, skidding on black ice and was hospitalized for two weeks. During this time, Steve was incredible, keeping the house, caring for our son, working his job, and making sure to visit me each day, often after picking up Jay first and then coming back to the hospital. I'll also never forget the picture of my son's kindergarten birthday party…a simple affair with 15 or so wired five-year-olds. Steve arrived home unexpectedly from work to see how the party was going, and was soon relegated to leading a game of mother-may-I in his charcoal suit in the back yard, giving me a few minute reprieve. He was and is devoted to our children and basks in their accomplishments. He is also the firmer hand of the two of us in setting standards for studying and ensuring consistent discipline.

I don't think there is any greater joy for him than to watch my son as he has developed into a terrific athlete and young man, representing our town on varsity football and hockey teams, and we hope baseball this year as well. Our daughter while not as focused on athletics, did stick out the freshman year of soccer to our delight, has wonderful friends, joined the ADL, and has many different interests, not the least of which are relatively unknown rock bands with names like Big D and the Kids Table. We are happy to serve as "unofficial hosts" to a student who lives in Boston and commutes over 25 miles each day to attend school in Scituate; during football season Jason often stays at our home when he is required to be at late evening or early morning football events (films, team breakfasts or dinners for example). As I write this letter, our children are attending the regional Cheerleading finals at Scituate High School, with the boys expected to wear shirt and tie in respect for the cheerleaders.

With the involvement of our children in town sports and activities comes a responsibility that we take seriously to support these organizations, not only through attendance at all games over many years, but also by organizing and spearheading fundraising efforts. In particular, we have helped the Scituate High hockey teams, (which unlike most other teams, do not enjoy full town funding) to raise over $15,000 the past two years. While it would have been easy for us not to get involved in this, as our son played varsity, and the need was at the j.v. level, we have felt it important to help support the entire program. Steve has independently lobbied a friend to donate autographed footballs from Patriots QuarterbackTom Brady the past two years, resulting in raffle sale tickets of over $3000. He also supports a neighborhood organization scholarship effort, working with me to select our scholarship recipients each year. He was the *only* father to show up this year at a football team kickoff barbecue, which earned him the honors to grill for about 75 hungry players and cheerleaders. His contributions are not through visible, leadership positions, but more in the way of helping out when and where there is a need. Not the least of these contributions is his attendance at just about every soccer, hockey, football, baseball, church event, school concert, art show that the children have ever been involved in, literally hundreds, or his weekly carpooling assignments. He is always a supportive presence in the stands, never complains to coaches, and is often, I notice this season, the first father the players seek out on the sidelines for a handshake and words of encouragement or praise. Only this weekend, I was talking with the varsity hockey coach who was dismayed that a parent had left an anonymous negative letter in

his mailbox. He said to me that he always welcomed talking with Steve when he ran into him whether in the parking lot before a practice, or at the town landfill drop-off, because Steve was one of the only parents who talk with him about anything *but* hockey.

You might be surprised at the number of parents who are unwilling to, or uninterested in, driving their children to out-of-town activities. Over the years, it was not unusual for Steve to receive a call directly from a friend of our son's who wanted to attend a certain game Jay was playing in, and had no transportation. Steve would gladly pick them up, taking them to dinner with us if that was our plan, see them into the game and then home again after the conclusion, often to a dark house. Our childrens' friends all know they can count on Steve or me for a ride if needed.

Traditions are important to Steve, and our lifestyle is pretty simple. Most weekends there is a large pot of soup, chili or stew simmering on our stove in the event that family, friends and neighbors, or our children's buddies stop by. Several years ago, when my son's first birthday fell on Thanksgiving, we hosted our first family Thanksgiving at our home in Scituate. This holiday has been held at our home each year since, with many recent years saddened by the loss of loved ones since our last holiday together. In earlier years, we also hosted a Thanksgiving breakfast for our children's friends before the football game that morning.

Another tradition Steve started was a family event in western Massachusetts. Several years ago, we thought rather than buying Christmas gifts for his brothers and sisters, it would be more meaningful to share a meal and nice evening together. As circumstances allowed, we have hosted Steve's family the week after Christmas for dinner at a local restaurant, preceded by the children exchanging small gifts.

My father died on Super Bowl Sunday in 2001, leaving my mother alone in her home. In August 2004, my sister Jane's husband died very suddenly at the age of 40 while they were vacationing in Puerto Rico and celebrating her then 8 year old son, Dominic's, birthday. She lives next to my mother in Milton. Nearby also live my brother Robert and his wife and family; my brother was paralyzed in a car accident at the age of 18. I bring this up because Steve is essentially the go-to guy for four households in the Boston area, including our own, when there is a need for heavy work to be done, or even as a wonderful host to our families. He has also tried to fill in and help my sister in the rearing of her son, who Steve just adores. One afternoon this summer, when they were visiting and we had planned to all go out for a late lunch, Steve decided it would be more worthwhile to stay home with Dommie, our nephew, and work on his baseball throwing and catching, so that's what they did. He is always kind and considerate to my mother, inviting her along on outings, to our home, or sharing quarters during family vacations. He takes pains to act as a wonderful host to her, preparing her favorite Oysters Bienville at the holidays. His absence will be felt greatly not only within our household, but especially to my mother and sister as well in their respective households as they continue to deal with the loss of a male or father-figure.

When Steve's father died, his mother was left with an organizational mess related to life insurance questions. Steve did not hesitate to pay his mother's legal bills related to this, with no expectation to see anything in return; he simply did this to try and help his mother. More recently, he was deeply distressed to see his sister's marriage fall apart, with particular concern for her children, our nephews who are wonderful. Thankfully, he does have brothers in western Massachusetts who are nearby to his mother and can be a source of support to her.

Several years ago, after the death of Steve's father, we found that Steve also had diabetes (type II). I am so concerned about his health, his need for privacy, his diet, and the general affects of the diabetes on him. He is careful about the need to work out often, but most nights see him having to get up several times, if he sleeps much at all. One of his greatest sources of comfort are long walks and runs in the woods of Wampatuck State Forest, near to our home. He has been under instructions to take several medications, although with the lack of our insurance due to financial difficulties, it has been a struggle to keep all of his medications current.

Over the last year, we have worked together diligently to develop a business plan that we believe can come to fruition, building off of Steve's recent work in the traffic safety industry in Massachusetts. We are both, of course, anxious to see if he might be given the opportunity to pursue this and build some financial base again, the sooner the better.

During these past several weeks, his efforts have centered on trying to prepare our home and family for what the future will hold. He is researching potential colleges for our son, cutting down trees that he is worried might fall, pruning others, and teaching my son the finer points of recycling at trips to the town transfer station, I think so I will be spared this task.

I appreciate any willingness on your part to consider these positive aspects of Steve's life in your sentencing decision, and ask for any leniency you can provide so that Steve can continue to be a part of the upbringing of our children during these important teenage years and again contribute financially to our household and to whatever fines are imposed. I want my children to be able to see their father as much as possible and to continue their strong relationship with him and ask that you facilitate that by sending him as close to our home as possible.

I apologize for the length of this letter, but wanted to give you a sincere picture of my husband and the father of my children. Thank you for taking the time to read this.

Yours truly,

Gail Kelley Milkiewicz



December 11, 2005

The Honorable Paul J. Barbadoro, Chief Judge
United States District Court of the District of New Hampshire
409 Warren B. Rudman United States Courthouse
55 Pleasant Street
Concord, NH 03301

Dear Judge Barbadoro:

I am the friend and brother-in-law of Steve Milkiewicz, who has appeared before your
court, and I am writing to provide information in the hope that you might consider it with
regard to his case.

I have known Steve since the late 1970s, when I awoke one Thanksgiving morning to
find a guy about my age sleeping in the bedroom next door. I learned from my mother
and sister Gail, that it was Gail's boyfriend who had come home from school with her to
share Thanksgiving at our house. Steve was not my sister's first boyfriend, and given that
she was still in college, I didn't expect him to be her last. However, from that first day in
meeting him, I was impressed by the fact that he was a polite, respectful, caring person,
who was warm-hearted, funny, and quick to help with the dishes – even on Thanksgiving
before there were dishwashers. My sister must have seen the same thing, as they have
been together ever since. Steve has been a loving and loyal life partner to my sister for
more than 25 years.

Steve and Gail and I all went to UMass Amherst. None of our families had much money,
and while working and going to school, Steve worked extremely hard for 3 years as a
running back for the football team. By his junior year, he was alternating into games for a
number of plays. His senior year offered great promise, as he had worked hard to become
one of the team's starting running backs. But he hurt his ankle in one of the first couple
of games and missed his opportunity for personal glory. However, Steve is a team player;
and he stayed thoroughly engaged and still dedicated his energies to encouraging his
teammates from the sidelines for the balance of the year.

Steve married into a family of 5 brothers and sisters, two parents, one grandmother, and a
number of brothers- and sisters-in-law who were very strong-minded and opinionated.
Yet Steve is always among the most liked and trusted persons in the family. He can be
trusted to give you his honest thoughts, and he can be trusted to be a nurturing,
understanding soul who provides comfort, humor and perspective to some of the outlaws
(including me) at times when the rest of the group can be overpowering.

Steve is very generous and welcoming. Steve and Gail host more than their share of
family parties, and Steve often does much of the cooking. This gives him an opportunity
to display his creativity, his appetite for life, and his generosity. He spends much of his

time at these events looking out for the welfare and happiness of others, and can relate to everyone whether it's a young child or an eccentric older relative.

Most of Steve's free time is devoted to his family. He has taught, nurtured, and helped raise two of the nicest, most polite, successful children you will ever meet. Steve's son is a star in multiple sports, and his daughter is a very accomplished dancer and athlete as well. But more important than that, they are really nice kids who love playing with and looking after their younger cousins, and who work hard to be the best that they can in life. He and Gail have taught them well.

Finally, I would ask that you consider how much Steve has given to all of us, and especially to his children and wife. Whatever sentence that is imposed will be not just on one person, but on three additional innocent people who need Steve in their life right now. I know that this family has suffered greatly already, and any opportunity that you have to look favorably on Steve and his family at this time will be greatly appreciated.

Thank you so much for your consideration.

Sincerely:

Harold G. Kelley

2 Pilgrims Way, Gaylordsville, CT 06755, 914-656-6681

*From the desk of*
*Daniel J. Chevalier*

December 15, 2006

The Honorable Paul J. Barbadoro
Warren B. Rudman U.S. Courthouse
55 Pleasant Street
Concord, NH 03301

Dear Sir:

My family has been friends with the Milkiewicz family for well over 20 years. My wife and I would visit and vacation with Steve and Gail for years before our children were born. My daughter Alexandra (Allie), now 16, has grown up with great memories of visiting with Jay (16) and Cammie (14) and my son John (13) as well who also looks up to Jay like an older brother.

I am originally from Holyoke, MA and have known Steve since our childhood days. I met Gail while they were dating at UMASS. I have always found Steve to be a hard working man, a loyal husband, and most importantly, in my book, a dedicated great father. He has been a good friend to my wife and I and my children and we are heartbroken over the mistakes he has made here and the impact it has had on his family throughout this whole ordeal.

A quick story to demonstrate the kind of man we are talking about. My daughter ended up not having a date for her 8th Grade semi-formal dance; an event that is a highlight to all girls up through their early teens. When I told Steve about this situation he called back the next day and asked if we would be OK with Jay coming down to escort Allie to the dance. Sure enough the night of the dance the Milkiewicz family showed up, Jay in his suit and with flowers and off they went to make my daughters night another memorable event.

The thought of Gail suffering through what Steve must endure and the painful thought of Jay and Cammie being with out their Dad is very disturbing. I was a Criminal Justice major in college so I never condone illegal behavior and support paying for wrongful acts. Without minimizing the severity of the alleged crimes here I have also learned that there are different levels of paying ones debts and imprisonment for any amount of time when this family man needs his family and they need him seems unjust.

Please show Mr. Steven Milkiewicz, husband, father, son, brother, uncle, and friend some leniency as you consider how he pays for his mistakes.

Sincerely,

Dan Chevalier

35 Voses Lane
Milton, Massachusetts  02186
(617) 570-9488
December 9, 2005

The Honorable Paul J. Barbadoro
United States District Court
District of New Hampshire
409 Warren B. Rudman United States Courthouse
55 Pleasant Street
Concord, New Hampshire  03301

Dear Judge Barbadoro:

On December 22, Steven A. Milkiewicz will appear before you for sentencing.  Steve is married to my sister, Gail, and I have known him for 27 years.  I feel I am qualified to objectively comment on his character.

When I was a freshman in college in 1979, I was severely injured in an accident that left me disabled.  Today I am fortunate to be able to walk with crutches, which I use full-time.  This was easily the darkest period of my life, and I am forever grateful to Steve for all he did for me during that difficult period.  He was an upperclassman at the University of Massachusetts at that time, and I returned there in a wheelchair after my accident.  Though I hardly knew him then as he and Gail were just dating, he would stop by my room to look in on me, help me carry or move things, etc.  When one is faced with this type of adversity, you always remember the small handful of people who truly stepped up when you needed it the most.

I am now at the age where you start hearing about couples splitting up and you remember attending their wedding when you were in your twenties.  Steve and Gail did things differently than most couples--their marriage is now 24 years strong.  The respect that he has shown my sister on an *everyday* basis--not just anniversaries, etc.--has been a model of how you commit yourself to your wife, and I have tried to emulate the way he treats Gail in my own marriage.  I am sure their friends feel as strongly as I do.

As a parent, I feel that the best contribution we can make to the world is to raise our children the right way.  Steve and Gail have two wonderful children, Jay (a junior in high school) and his younger sister Cammie (a freshman).  I asked him recently how many dance recitals, athletic events, and practices he had made time to attend for Jay and Cammie over the years and we figured it had to be easily over a thousand.  Win or lose, all kids want to look up in the stands and know their dad is there watching them compete.  I have two children who compete and I can assure you that most dads *never* come to practice and about half come to their games.  Steve always made his children a priority and has two really nice kids as a result.

I was able to attend eight of Jay's football games in the last three months and have probably stood next to Steve for 20 hours on cold Friday nights this fall.  I can promise you that he regrets every shred of his mistake and he knows that the real victims of his crime will be the three people he loves the most.  Steve came from humble beginnings, straight from the housing projects of Holyoke, MA, and he worked to achieve a better life.  He will again be a working, taxpaying productive member of our society, rather than a daily expense for our country.  I respectfully ask that you can find a reason to make that happen sooner rather than later.

Thank you for listening and I am grateful for any consideration.

Respectfully yours,

Robert W. Kelley

December 6, 2005

The Honorable Paul J. Barbadoro
Warren B. Rudman U.S. Courthouse
55 Pleasant Street
Concord NH 03301-3941

Dear Sir:
    I am writing to you in a
plea for clemency in the
sentencing of my son-in-law,
Steven A. Milkiewicz.

    Steve has been married to
my daughter, Gail, for almost
twenty-five years. During that
time, he has always been a
hard-working, loving husband.
Prior to their marriage, Steve
worked his way through the
University of Massachusetts,
Amherst, with little or no
support from his parents.

Now he is the father of two great children, Jay and Cameron. He has been a strong, devoted presence in their lives, lending his support in school, sports and community programs. Jay and Cameron are 17 and 14 respectively, most vulnerable ages for young people, and a time when strong parental guidance is important.

Steve has always been a caring son-in-law, a gracious host and very helpful to my husband and me. Since my husband died almost four years ago, Steve has played an even more supportive role

in my life.

In short, Steve is a good man.

Thank you, sir, for any consideration you may give this request.

Sincerely,

Joyce E. Kelley

To:  The Honorable Paul J. Babadoro

My name is Jane V. Dones and I am writing this letter,  if I may, on behalf of my brother in law Stephen A. Milkiewicz.

Steve Milkiewicz has been a part of my life since I was 15 years old.  I am the younger sister of his wife Gail Milkiewicz.  In the 27 years I have known Steve,  I have never had any type of an altercation or problem with him. He has always been a wonderful host, husband, father, brother in law,  and uncle to myself and my family.

In the summer he always has a family party, and takes pride in preparing and cooking great dishes for everyone else to enjoy.  He has always appeared to be a very devoted husband and father to my sister and his children.   He takes great pride in going to all his children's extra curricular activities,  especially his son Jay's athletic games.

Last July 31, 2004 while vacationing with my husband and 8 year old son in Puerto Rico,  my husband got sick over there and died suddenly in the hospital in Puerto Rico.   It was a shock to myself and my son to say the least.

When we arrived back at Logan airport at midnight, on Aug1, 2004, my family was there to greet us.  Only some of them came in to pick us up.  Jay Milkiewicz,  who was 15 at the time came to the airport to be there for my son,  who always loved him.   This shows you the type of children my sister and her husband have raised. ^When I got home to my house my sister and Steve Milkiewicz were there to receive me in my moment of grief.  They stayed late into the night to make sure I was alright.

Since my husbands death,  Steve has stepped up to help my son Dominic, who is now 9.   Last spring was Dominic's first year of little league.  Steve showed him the basics in his back yard in Scituate to try to get my son ready for the sport.   He and my sister have also taken my son overnnight to help me out when I have needed it.

This summer my son was going out for pop warner,  and again

uncle Steve, helped him prepare for the upcoming season.    My father who lived next door to us died of cancer 1 1/2 years before my husband.   So essentially my son lost the two most important men in his life, one week after turning 8 years old.   He does have another uncle who lives up the street, but he is considered paralyzed from the waste down.  Steve Milkiewicz is the only other male role model for my son who has not abandoned him at this point.   I had to explain to my son already that uncle Steve may be going to jail,  just to get him ready for yet, another male figure leaving his life.

I ask you to please take this letter into consideration,  when deciding on your sentencing of my brother in law Steve Milkiewicz.    I have known many people in my life, both wonderful and terrible. Steve Milkiewicz would definately  be on my list as one of the more wonderful people.

Respectfully yours,

Jane V. Dones

Jane V. Dones
7 Voses Lane
Milton,  Ma 02186

December 11, 2005

The Honorable Paul J. Barbadoro
Warren B. Rudman U.S. Courthouse
55 Pleasant Street
Concord, NH  03301

RE:  Steven Milkiewicz

Your Honor,

We have been privileged to have known Steve Milkiewicz and his family for more than
10 years.  We live in the same small town and became friendly with Steve because of our
mutual interest in our children's sports and school activities.

Steve is first and foremost, a family man.  It has been obvious to us, over the years, that
his children are his pride and joy.  Steve was always in attendance at sports events and
was not only supportive of his own children, but was always encouraging and motivating
other players to do their best.  We have participated in many birthday parties and school
events with the Milkiewiczs' and Steve could always be counted on to volunteer if help
was needed.  We left our children in his care on many occasions knowing that we could
trust him completely and without reservation.

Steve Milkiewicz has always been a loyal and thoughtful friend.  We admire his personal
integrity, his sense of humor, and his strong family values.  We respectfully request that
his long history as a devoted father and husband, as well as a contributing member to our
town and community be considered.

Sincerely,

Steven and Michelle Parker
36 Ocean Avenue
Scituate, MA

U.S. District Court Purchases from J. Cameron Co. and CJ Sales

Cost of Goods Sold to U.S. District Court from J. Cameron Co.

## False Claims Counts

| Court Invoice Date | Quantity Billed | Price Charge Per Unit | Gross Receipts (incl. shipping) |
|---|---|---|---|
| 31-Jan-2000 | 40 | $68.00 | $2,720.00 |
| 31-Jan-2000 | 30 | $102.50 | $3,075.00 |
| 31-Jan-2000 | 50 | $81.50 | $4,075.00 |
| 31-Jan-2000 | 85 | $51.25 | $4,356.25 |
| 31-Jan-2000 | 45 | $115.00 | $5,175.00 |
| 31-Jan-2000 | 84 | $65.00 | $5,460.00 |
| 25-Apr-2000 | 600 | $35.95 | $21,570.00 |
| 31-May-2000 | 20 | $288.00 | $5,760.00 |
| 14-Aug-2000 | 500 | $35.95 | $17,975.00 |
| 6-Oct-2000 | 500 | $36.95 | $18,475.00 |
| 9-Oct-2001 | 60 | $45.00 | $2,700.00 |
| 9-Oct-2001 | 400 | $36.95 | $14,780.00 |
| 9-Apr-2002 | 400 | $33.95 | $13,580.00 |
| 22-Apr-2002 | 30 | $59.00 | $1,770.00 |
| 22-Apr-2002 | 75 | $81.00 | $6,075.00 |
| 22-Apr-2002 | 20 | $85.00 | $1,700.00 |
| 22-Apr-2002 | 20 | $85.00 | $1,700.00 |
| 22-Apr-2002 | 20 | $106.00 | $2,120.00 |
| 22-Apr-2002 | 30 | $115.00 | $3,450.00 |
| 22-Apr-2002 | 30 | $169.00 | $5,070.00 |
| | | | $139,886.25 |

| Product | Vendor Invoice Date | Quantity Purchased | Price Paid Per Unit | Cost of Goods Sold (incl. shipping) | Price Difference | Quantity Difference |
|---|---|---|---|---|---|---|
| HP92295A | 10-Feb-2000 | 15 | $61.61 | $924.15 | $95.85 | $1,700.00 |
| HP92291A | 10-Feb-2000 | 30 | $92.48 | $2,774.40 | $300.60 | |
| HP92298A | 10-Feb-2000 | 30 | $67.00 | $2,010.00 | $435.00 | $1,630.00 |
| HPC3906A | 10-Feb-2000 | 53 | $46.22 | $2,449.66 | $266.59 | $1,640.00 |
| HPC4127X | 10-Feb-2000 | 36 | $105.00 | $3,780.00 | $360.00 | $1,035.00 |
| HPC4092A | 10-Feb-2000 | 84 | $47.00 | $3,948.00 | $1,512.00 | |
| Hammermill Tidal Paper | 2-May-2000 | 400 | $25.75 | $10,300.00 | $4,080.00 | $7,190.00 |
| 100% Strathmore Brite White | 2-Jun-2000 | 10 | $225.00 | $2,250.00 | $630.00 | $2,880.00 |
| Hammermill Tidal Paper | 24-Aug-2000 | 400 | $25.65 | $10,260.00 | $4,120.00 | $3,595.00 |
| Hammermill Tidal Paper | 10-Nov-2000 | 400 | $26.15 | $10,460.00 | $4,320.00 | $3,695.00 |
| Color Paper | 17-Oct-2001 | 60 | $32.50 | $1,950.00 | $750.00 | |
| Hammermill Tidal Paper | 17-Oct-2001 | 300 | $23.50 | $7,050.00 | $4,035.00 | $3,695.00 |
| Hammermill Tidal Paper | 10-Apr-2002 | 200 | $23.00 | $4,600.00 | $2,190.00 | $6,790.00 |
| HPC4092A | 24-Apr-2002 | 20 | $52.00 | $1,040.00 | $140.00 | $590.00 |
| HP92298A | 24-Apr-2002 | 50 | $72.00 | $3,600.00 | $450.00 | $2,025.00 |
| HP92295A | 24-Apr-2002 | 20 | $85.00 | $1,700.00 | $0.00 | |
| HP92291A | 24-Apr-2002 | 17 | $105.00 | $1,785.00 | $17.00 | $318.00 |
| HPC4127X | 24-Apr-2002 | 20 | $109.00 | $2,180.00 | $120.00 | $1,150.00 |
| HPC4182X | 24-Apr-2002 | 20 | $163.00 | $3,260.00 | $120.00 | $1,690.00 |
| | | | | $76,321.21 | $23,942.04 | $39,623.00 |

# Memorandum



*United States Attorney*
*District of Massachusetts*

| Subject | Date |
|---|---|
| United States v. Steven Milkiewicz, CRIMINAL NO. 04-10339-PJB  NH  CR04-213-01-PB Prosecution Version of Offense Conduct | September 30, 2005 |

To
Cathy Battistelli, United States Probation Office
Warren B. Rudman United States Courthouse
55 Pleasant Street
Concord, NH 03301

From
Paul G. Levenson

cc:    Bruce A. Singal, Esq.
Michelle R. Peirce, Esq.
Donoghue, Barrett & Singal, PC
Suite 1320
One Beacon Street
Boston, MA 02108-3113

The United States, by its undersigned counsel, submits the following Prosecution Version

of Offense Conduct.

1.    Introduction

Following a two-week jury trial, on September 16, 2005, Defendant Steven Milkiewicz

was convicted on the following counts of the Indictment in this case:

Count 1:    18 U.S.C. §371 (Conspiracy to Defraud United States)

Counts 2-9    18 U.S.C. § 287 (False Claims Against the United States)

Counts 17-20: 26 U.S.C. § 7206(1) (Filing False Tax Returns)

As charged in the Indictment, Milkiewicz conspired with his co-defendant, Timothy

Schroeder to defraud the Clerk's Office of the United States District Court for the District of

Massachusetts. By rigging the process of bidding for contracts over $2,500, Schroeder and

Milkiewicz managed to steer the bulk of the Court's purchases of Office Supplies and Furniture to

Milkiewicz and to companies that paid commissions to Milkiewicz.

Schroeder was formerly the Property and Procurement Administrator for the Clerk of the Court for the United States District Court for the District of Massachusetts, a position he had occupied for approximately 10-12 years prior to his discharge in July 2002. (Schroeder had worked for the clerk's office approximately 22 years in all). Schroeder's co-defendant Steven Milkiewicz (who has pled not guilty), was in the business of selling office supplies under the names C.J. Sales and J. Cameron Company, with the court as his major customer.

Between approximately February 1997 and June 2002, Schroeder and Milkiewicz conspired to rig bids/quotes for various office supplies and office furniture that Schoeder purchased for the court, with the result that the court paid grossly inflated prices for a wide range of items. In addition, they conspired to steal outright, as Schroeder allowed Milkiewicz to bill the court for quantities of supplies and furniture substantially in excess of what was actually delivered. Milkiewicz gave Schroeder a share of the proceeds of the fraud in the form of cash kickbacks.

In filing his tax returns, Milkiewicz understated the gross receipts of his office supplies business by approximately $20,000 per year for tax years 1997 through 2000. He also substantially overstated his cost of goods sold by amounts that ranged from $25,000 to $76,000.

2. The Fraud Scheme

a. The Bid-Rigging

The evidence offered at trial, including procurement files from the District Court, reflects the Milkiewicz's repeated submission of sham bids/quotes for items supplied by Milkiewicz's companies, J. Cameron Company and C.J. Sales. Many of the price quote packages include one bid each from J. Cameron Company and C.J. Sales (creating the appearance of two competitive bids). In many instances third "bids" are shown as coming from A&G Sales or Tracy Sales. Schroeder testified that Milkiewicz provided him with those bids, which were shown to be

2

forgeries. In a few instances, the third "bids" came from MS & Associates, i.e., from Schroeder himself.

Milkiewicz began using the name J. Cameron Company for his office supplies business in late 1996 (beginning shortly before he left his employment as a salesperson for the office supply company Tracey Sales Inc.). The mailing address for J. Cameron Company was a Post Office box in Boston, in the J.W. McCormack Building, which housed the United States District Court until the fall of 1998. In 1999, Schroeder suggested that Milkiewicz begin using a second company name, in order to deflect concerns that too-much of the Court's procurement business was going to a single vendor. Milkiewicz then obtained a second Post Office box, in North Scituate, Massachusetts, in the name C.J. Sales. Milkiewicz used the C.J. Sales name for contracts with the District Court. He did not use the name for any other business dealings. In particular, it does not appear that any payments for goods or supplies were ever made from the C.J. Sales bank account.

In addition to forging bids from third parties, Milkiewicz arranged for friendly "competitors," Richard Kelly of New England Office Supply (NEOS), and Henry Franzone of Northeast Space Solutions, to submit inflated bids at a pre-arranged price. Kelly testified that he bid at prices dictated by Milkiewicz or, on occasion, simply bid "high" at Milkiewicz's direction. When Milkiewicz "won" the contract (which Kelly said occurred 90% of the time), Kelly then supplied the goods to be delivered, at Kelly's regular price. Kelly testified that, for the quantities Milkiewicz ordered, the prices he paid were the ordinary prices that NEOS would have charged any customer, including the Court. Thus it is apparent that – to the extent that Milkiewicz actually delivered product to the Court – the prices that the Court paid for goods that were ultimately supplied by NEOS were fraudulently inflated as a direct result of the bid-rigging fraud scheme.

3

In addition to selling directly to the Court under the names J. Cameron and C.J. Sales, Milkiewicz arranged to act as a sales agent for various companies. In those dealings as well, Milkiewicz arranged to submit inflated bids. The companies he represented would simply increase their proposed prices, on the understanding that they would pay Milkiewicz excess mark-up above their ordinary prices. For furniture suppliers Franzone Associates and Northeast Space Solutions (both controlled by Henry Franzone), Milkiewicz directed the preparation of multiple fraudulent bids and ultimately dictated the prices that Franzone charged the Court. Other sellers, such as The Ink Spot (a printer) and Falvey Finishing (a furniture refinisher) simply raised their prices – at Milkiewicz's direction – in order to cover the "commissions" they paid to Milkiewicz. Both The Ink Spot and Falvey Finishing have subsequently done business directly with the Court, charging only their base prices (i.e., without the mark-up for Milkiewicz's "commissions"). The owner of Falvey Finishing has noted, however, that while he is happy to charge the lower price, he believes that the higher prices charged at Milkiewicz's direction were still reasonable. It is impossible to reconstruct what prices would have been charged, and whether Milkiewicz would have received any commissions at all from these businesses, if Schroeder and Milkiewicz had not been colluding. In any event, it does not appear that the additional losses to the District Court would affect Milkiewicz's guideline sentencing range.

Attached are copies of Trial Exhibits 1a through 1d, which include a detailed schedule reflecting the District Court's purchases from J. Cameron Company and CJ Sales. Milkiewicz's total mark-up, above the actual prices charged by the suppliers from whom he obtained goods, is shown on Exhibit 1, in the column labeled "Price Difference." The total price difference is $158,149.25. While it is certain that the total prices paid by the District Court were fraudulently

4

inflated as a result of the bid-rigging scheme, in most instances it is impossible to determine precisely how much the District Court overpaid.

Richard Kelly's trial testimony established that – but for the fraud scheme – NEOS would have been willing and able to sell its goods (such as large quantities of copy paper and printer toner cartridges) directly to the District Court, at the same prices Milkiewicz paid. Thus, for products sold by NEOS, the full amount of Milkiewicz's mark-up constituted a loss to the District Court. The amount of Milkiewicz's mark-up attributable only to goods supplied by NEOS is $61,778.85.

For other goods, the evidence is less clear cut and it is virtually impossible to reconstruct what price the Court would have paid. Under these circumstances, where it is certain that there was a loss, but the amount of that loss cannot reasonably be determined, the United States suggests that the amount of Defendant's full gain of $158,149 is properly used in place of the loss figure. See U.S.S.G. §2B1.1, comment. n. 3(B).

b.     Charging for Goods Not Delivered

In addition to allowing Milkiewicz to price-gouge through collusive bids, Schroeder also arranged with Milkiewicz to charge the District Court for items that were never delivered. To take a single example, on April 25, 2000, Milkiewicz billed the court $21,570 for 600 cartons of copier paper. In connection with that order, Milkiewicz arranged with NEOS to deliver only 400 cartons. Thus Milkiewicz charged the court for 200 cartons that he never delivered, at $35.95 per carton. In this transaction, the loss to the Court included both (a) the price the court paid for goods that were never delivered; and (b) Milkiewicz's mark-up of $10.20 per carton, from NEOS standard bulk-discount price of $25.75 per carton. Thus the losses reflected on Exhibit 1 include $4,080 in the Price Difference column (400 cartons actually delivered x $10.20) and $7,190 in the

5

Quantity Difference column (200 cartons "shortage" x $35.95 per carton). Each of Counts 2-9 (False Claims Act), involved a separate transaction in which Milkiewicz charged the Court for goods in quantities that exceeded the amounts Milkiewicz actually acquired from NEOS.

The amounts charged to the court for non-existent goods are reflected in Exhibit 1, in the column labeled "Quantity Difference." That Exhibit reflects charges for goods that were not delivered totaling $146,191.32.

For purposes of calculating loss from the scheme to defraud, there is one additional transaction which should be included. In this instance, Schroeder helped Milkiewicz bill the Probation Office of the District Court for 59 leather office chairs that were never delivered. While this transaction was excluded from the final version of Exhibit 1 (in order to avoid confusion about the appropriateness of adding purchases by the Probation Office to purchases by the Clerk's Office), it is properly included – whether it is treated as part of the conspiracy or as relevant conduct – in the loss calculation.

The transaction in question occurred in September/October 1998, at the very end of the fiscal year, during the considerable confusion associated with the move into the new courthouse in Boston. Milkiewicz provided Schroeder with price "quotes" for the items in question, which Schroeder passed along to the procuring official in the Probation Office, whom he was "assisting." Milkiewicz also dealt directly with the procuring official, who intended to acquire 59 leather chairs for the staff of the Probation Office.

Ultimately, two purchase orders were signed on September 30, 1998, each for for 59 leather chairs. One of the purchase orders, to Northeast Space Solutions, Inc., was for 59 Stylex brand chairs, at $310.40 each, for a total cost of $18,313.60. Milkiewicz, as salesperson for Northeast Space Solutions, Inc., received a commission in connection with this sale. Records of

6

Northeast Space Solutions reflect that 59 Stylex chairs were actually obtained and were delivered to the Court. The Probation Office procuring official dealt with Milkiewicz as the sales person for that transaction and it appears that he was paid a commission in connection with that sale. The second purchase order, to J. Cameron Company, was also for 59 chairs, at $408.75 each, for a total cost of $24,116.25. Milkiewicz submitted an invoice in the name of J. Cameron Company, which identified the chairs invoice only as "161-10 leather chairs." The chairs were identified in a price quote from FranzOne Associates as "Gregson Chairs # 161 upholstered with your choice of leather."[1] In second price quote from, which purports to be from "Corporate Environments" but which appears to be a fabrication, the items are identified as "Greg 161-10 Office Chairs – Leather Upholstered." The United States has been unable to identify any brand of Greg or Gregson chairs or any other chairs designated by model number 161-10. In any event, checking the chairs that were actually in use at the Boston Probation Offices (in the Courthouse and in the Williams Building) as of 2002, revealed that only Stylex leather desk chairs were present.

Combining the total of undelivered goods charged to the Clerk's Office ($146,191.32) with the amount the District Court paid for the non-existent "Greg[son]" chairs for the Probation Office ($24,116.25), yields a total loss from shortages of $170,307.57.

Combining the losses from bid rigging ($158,149.25) with the losses from non-delivered goods ($170,307.57), the total loss fraud loss to the United States is $328,456.82.

---

[1]    Henry Franzone, the owner of Northeast Space Solutions, told IRS agents that he was familiar with a brand of Gregg or Gregson chairs, but stated that he was not a dealer for that brand and did not know any sellers of such chairs.

If the bid-rigging losses are deemed to include only Milkiewicz's mark-up of NEOS goods ($61,778.85), the aggregate fraud loss figure is reduced to $232,086.42 (i.e. $170,307.57 + $61,778.85).

### 3.    False Tax Returns, Tax Loss

As reflected in the trial testimony, Milkiewicz signed false tax returns which were prepared by James Keegan, a professional tax preparer. As Keegan testified, the information that he entered on the tax returns for Milkiewicz's Schedule C business was provided to him by Milkiewicz. Keegan noted that he did not perform any accounting or bookkeeping services for Milkiewicz, apart from tax return preparation, and thus took Milkiewicz's representations regarding gross revenues and costs of goods sold at face value.

The tax losses in this case result from Milkiewicz's under-reporting of his gross receipts and over-stating of his costs of goods for his business. A calculation of the tax loss for the pertinent tax years, is set forth in Trial Exhibits 2, 2a and 2b. Exhibit 2 reflects a total tax loss of $109,531.81. Leaving out the $4,836.88 loss attributable to the 2001 tax year (for which Milkiewicz was acquitted) the tax loss figure is reduced to $104,694.93.

### 4.    Leader/Organizer

While Milkiewicz and Schroeder occupied roughly co-equal roles in the conspiracy, Milkiewicz was responsible for recruiting additional participants (apparently without Schroeder's being specifically aware of the additional participants roles). Specifically, Milkiewicz arranged for his college-buddy, Richard Kelly, to provide fraudulently inflated price-quotations to the district court on the understanding the Kelly would, in turn, be able to sell the goods in question to Milkiewicz when Milkiewicz won the contracts. Kelly, who testified under an immunity agreement, acknowledged that he knew what he was doing was "morally wrong" but stated that

8

he did not know he was breaking the law. Similarly, Henry Franzone, owner of Northeast Space Solutions and of Franzone Associates, supplied inflated price quotes, and multiple quotations under separate company names (including his own companies, as well as Joyce Interiors), at Milkiewicz's direction. While Franzone did not testify at trial, he too has indicated that he did not understand his actions in providing dummy "quotes" to be illegal.

There is no evidence that either Kelly or Franzone was aware of the full nature and extent of Milkiewicz's and Schroeder's fraud. In particular, neither is implicated in the scheme to charge the court for undelivered goods. By their own admission, however, both Kelly and Franzone each knowingly submitted fraudulently inflated bids, for the purpose of creating the false appearance of legitimate competitive bidding, in order to assist Milkiewicz in winning U.S. government contracts. As such, both were criminally responsible participants.[2]

5.    Obstruction of Justice

After Schroeder's criminal conduct was discovered and the fraud conspiracy came to an end, Milkiewicz attempted – on three occasions – to obstruct the investigation. The first attempt was in Milkiewicz's interview with federal investigators, to whom he offered a misleading account of his business with the Court. The second attempt, within a week after Schroeder's firing, involved trying to persuade a witness, William Pike, to help cover up the use of forged price quotes in the bid-rigging scheme. The second attempt, which began a few months later, involved a scheme to pay an individual whom Milkiewicz believed to be a former IRS official to somehow "fix" his case and cause the IRS to drop Milkiewicz as a target of investigation.

---

[2]    While both of these individuals claim they did not know that such actions violated the law – a patently mistaken view – actual knowledge of the applicable law is not required to establish fraudulent intent.

Immediately after Schroeder's crimes were discovered, Special Agents of the FBI and IRS began investigating procurement practices at the district court. In that connection, they contacted Milkiewicz by telephone on July 5, 2002, and asked him if he had ever paid any kind of bribe or kickback to Schroeder. Milkiewicz denied any such dealings. On July 8, 2002, two agents met Milkiewicz at his home and asked additional questions about bidding practices at the court. The agents also served Milkiewicz with a Grand Jury subpoena, seeking documents from J. Cameron Company.

In the interview Milkiewicz acknowledged that he had a social relationship with Schroeder, but claimed that this extended only to meeting occasionally for drinks. In reality, Milkiewicz and Schroeder were regular drinking buddies, meeting 3 or 4 times per week.[3] Milkiewicz made no mention of the fact that he and Schroeder had also traveled together to Las Vegas (on at least 7 occasions since 1997) and to Foxwoods Resort in Connecticut. More importantly, Milkiewicz falsely claimed that J. Cameron Company and C.J. Sales were used for different kinds of business, the former for furniture sales and the latter for office supplies. He denied using the two company names to submit multiple bids on a single contract and then revised his assertion, claiming that there might be rare occasions when he submitted claims from both companies. In particular, he claimed, he may have submitted a bid from a second company when a bid had been outstanding for over 90 days and his bid had expired. He also claimed that there were occasions when he submitted a second bid if Schroeder told him his original bid was "out of the ballpark."

---

[3]    Trial Exhibit 3 summarizes approximately 450 entries reflecting non-cash purchases by Schroeder and/or Milkiewicz at the Imperial Garden, a bar and Keno-parlor where the two regularly met for drinking and gambling.

Milkiewicz denied that Schroeder gave him any inside information on bids, going so far as to claim that Schroeder would not even tell him if he was $5 too high or too low. And finally, Milkiewicz denied again ever paying money to Schroeder, embroidering his story by noting that perhaps there were minimal payments for charity fund-raisers conducted by their respective children.

Having learned, in the interview, that federal agents were inquiring about the bona fides of the bidding process in the District Court, Milkiewicz acted swiftly. The same day, July 8, 2002, Milkiewicz called William Pike, a one-time colleague in the office supplies business whom Milkiewicz had only spoken two a few times in the previous five years. Milkiewicz told Pike that he could not talk on the phone and asked to meet Pike the next day. On July 9, 2002, Pike met Milkiewicz at a parking lot in South Boston. Milkiewicz, who appeared agitated, told Pike that Schroeder was in trouble and that there was an investigation underway. Milkiewicz then asked Pike to "back-date" some price quotes. Pike refused and told Milkiewicz he would not lie for him. Milkiewicz then told Pike, "this conversation never happened."

Pike, of course, was unaware of the reason why Milkiewicz was so desperate to get him involved. Pike had no idea that Milkiewicz had prepared 8 or 10 forged "price quotes" in the name of Pike's employer, A&G Sales. Nor did Pike know that his name and a forged signature appeared on those bogus "quotes."

By July 16, 2002, Milkiewicz had hired a lawyer who corresponded with the United States Attorney's Office regarding the production of documents requested in the investigation. Nevertheless, in September or October 2002, Milkiewicz embarked upon a scheme to obstruct justice on a more grandiose scale.

Milkiewicz was introduced to a Certified Public Accountant in Burlington, Massachusetts, G.T. GT upon learning that Milkiewicz was the subject of a criminal tax investigation, informed Milkiewicz that he had a friend who knew someone who could help him. On October 26, 2002, GT introduced Milkiewicz to an individual who was using the name "John." "John" told Mr. Milkiewicz that he in turn knew a former high government official, who might be able to make Mr. Milkiewicz's case "go away." "John" subsequently told Milkiewicz that he had told the former official about Milkiewicz's problem, and that the former official said he "could take care of the case." "John" told Milkiewicz that he would have to pay $20,000 as a down payment, to be followed by an additional $55,000, payable after Milkiewicz was no longer the target of the IRS investigation.

On October 31, 2002, Milkiewicz's wife, Gail Milkiewicz withdrew $20,000 from an IRA account and endorsed the withdrawal check to GT. Milkiewicz then gave the $20,000 check to GT, on the understanding that it would be paid over to the former "official."

In actuality, GT "John" and a third individual MA were conducting an elaborate con game. There was no high government official who could "fix" Milkiewicz's case.

By March of 2003 Milkiewicz realized that he had been scammed and, with a new attorney, approached the United States Attorney's Office. At that time Milkiewicz made a proffer regarding various matters [the proffer was made pursuant to a letter agreement which prohibits direct use of Milkiewicz's statements against him] and agreed to cooperate in the investigation of the con-men who had taken his money. In connection with the investigation of GT and others, Milkiewicz conducted numerous consensually-recorded telephone conversations with GT and his associates. Those recordings have been used in the investigation of potential charges against GT and others.

12

6.    Guideline Calculation

Based upon the factors discussed above, it is the United States' position that the following

are the applicable provisions of the United States Sentencing Guidelines:

GROUP I

§2B1.1 (Larceny, Embezzlement, and Other Forms of Theft etc.)
(a)      Base Offense Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
(b)      Specific Offense Characteristics:
         (1)     If the loss exceeded $5,000, increase the offense level as follows:
                 (G)   more than $ 200,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
§2B1.1(b)(8)(C)        Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
§3B1.1(c)    Leader Organizer (fewer than 5 participants) . . . . . . . . . . . . . . . . . . . . 2
§3C1.1 (Obstructing or Impeding the Administration of Justice)
         If (A) the defendant willfully obstructed or impeded, or attempted
         to obstruct or impede, the administration of justice during the
         course of the investigation . . . of the instant offense of conviction,
         and (B) the obstructive conduct related to (i) defendant's offense of
         conviction . . . increase the offense level by 2 levels . . . . . . . . . . . . . . . . . . . . 2

Group 1 total offense level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

GROUP 2
§2T1.1  (Fraudulent or False Tax Returns)
(a)(1)  Level from §2T4.1 (Tax Table) corresponding to the tax loss (>$80,000 and
        <$200,000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Group 3 total offense level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

COMBINED OFFENSE LEVEL
§3D1.4      Number of Units:
            Group 1     1 unit
            Group 2     ½ unit
            total       1½ units    add 1 levels . . . . . . . . . . . . . . . . . . . . . . 1
                                                                                      25